## BUILDING SERVICE EMPLOYEES LOCAL NO. 59 v. NEWHOUSE REALTY CO. et al.

No. 6074. Decided November 1, 1939. (95 P. 2d 507.)

*Clarence M. Beck* and *Homer Holmgren,* both of Salt Lake City, for plaintiff.

*Joseph Chez*, Atty. Gen., and *Oscar W. Carlson*, of Salt Lake City, for defendants.

MOFFAT, Chief Justice.

This being a case of first impression in this jurisdiction, we state the facts and law relating thereto more fully than we would had the problem been heretofore examined by this court.

Defendant having agreed that plaintiff's statement of the facts involved is substantially correct, we have accepted in the main the statement of facts thus agreed to.

The plaintiff, Building Service Employees Local No. 59, is a Trade Union, local to Salt Lake City, and is affiliated with the American Federation of Labor. It is also affiliated in the State of Utah with the Utah State Federation of Labor and the Salt Lake Federation of Labor. Plaintiff was organized in April, 1937, by certain employees of the Newhouse Realty Company working in the building service department of the Newhouse Hotel which comprises the housekeeping, linen and service departments of the hotel.

Under the constitution and by-laws of the plaintiff, all workers, male and female are eligible for membership in the organization, who are employed in the maintenance and upkeep of all private and public buildings, including hotels, so that such workers as janitors, porters, housemen, exterminators, fumigators, elevator operators, starters, window cleaners, scrub-women, maids, housekeepers and watchmen are eligible to membership.

The Newhouse Realty Company is a Utah corporation organized for the purpose of conducting a hotel business and in this connection operates the Newhouse Hotel in Salt Lake City, Utah. It operates in connection with its hotel business, a cafe and cafeteria business employing chefs, cooks, waiters and waitresses.

On September 4, 1937, the plaintiff herein filed with the Utah Labor Relations Board a charge, charging that the defendant, Newhouse Realty Company, had violated and was

violating Sections 8, 9, 10, of Chapter 55, Laws of Utah, 1937, commonly known as the Utah Labor Relations Act. The violations charged were as follows: That said defendant, by and through its executive agents, servants, and employees, dominated, interfered with and coerced its employees in violation of said Act in the following particulars: (1) It attempted to cause its employees to cease any contemplated or actual affiliation with any outside labor union and especially with plaintiff herein, and its employees were advised that they would be fired or discharged if they joined any outside union. (2) The joining of an outside union was discouraged by representing that the dues charged would be used to pay salaries and expenses, and that if the employees went on strike they would permanently lose their positions and the defendant would not be required to re-employ them; further, that if the employees would refrain from joining any outside union, their salaries would be raised and conditions of employment bettered. (3) That its employees were informed that it would be to their best interest to organize as a so-called company union composed exclusively of defendant's employees and such an organization was effected July 21, 1937, under the name of Newhouse Hotel Employees' Protective Association; (4) that defendant contributed financially to and otherwise dominated and interfered with the organization of said company union. It was further charged that as a result of the foregoing acts of the defendant, the right of its employees to self-organize, to form, join or assist labor organizations of their own choosing and to bargain collectively through representatives of their own choosing, was violated and interfered with.

It may be observed the defendant admits that the foregoing charges were made but denies the truth of such charges and denies that the charges were proved.

Upon the filing of said charges, and under date of September 8, 1937, the Utah Labor Relations Board issued formal

complaint against the Newhouse Realty Company, which complaint was based upon the charge as filed and alleged:

That defendant, in violation of Section 8 and Paragraphs (1, 2 and 3) of Section 9 and Section 10 of said Act, has by and through certain of its executive agents, servants and employees interfered with, discriminated against and intimidated its employees as follows:

The defendant has told and instructed its employees, in substance and effect, at various times since the 1st day of July, 1937, and down to the present time, that they should cease any contemplated or actual, affiliation with any outside labor union and especially complainant and if any of said employees had joined any outside labor union, including complainant, that such employees should immediately refrain therefrom.

That defendant, at various times ever since the day last aforesaid and in said manner, has told and informed its employees that they would be fired and discharged if they joined any outside labor organization and that if said employees engaged in a strike they would permanently lose their positions and jobs and that there was no law to compel defendant to reemploy said employees in the event of a strike and that a strike would permanently sever any employment connections whatsoever between defendant and its said employees and on the contrary if said employees would engage in a concerted effort to form a so-called company union, whose personnel should be made up exclusively of defendant's employees, then and in that event the salaries of said employees woud be raised and other conditions of employment bettered.

That defendant has violated Section 8 of said Act and paragraphs (3 and 5) of Section 9 of said Act, and Section 10 of said Act in this, to-wit: That said defendant has, at various times, previous to the 1st day of August, 1937, refused to negotiate and bargain collectively with complainant in behalf of defendant's employees notwithstanding the fact that complainant, at said times was duly authorized to

act as bargaining agent in behalf of a majority of defendant's employees in a unit appropriate for such purposes.

That defendant has violated Sections 8, 9 and 10 of said Act in this, to wit: That by and through various of defendant's agents, servants and employees, on or about the 10th day of July, 1937, and at various times thereafter, defendant told and informed its employees, in substance and effect that it would be to the best interest of said employees for said employees to organize a so-called company union composed exclusively of defendant's employees and that in consequence of the activity, suggestions and instructions of defendant on or about the 21st day of July, 1937, under the firm name and style of "Newhouse Protective Association"; that defendant contributed financially to, interfered with and dominated the organization of said company union.

That defendant, at various times ever since the 10th day of July, 1937, and down to the present time, by and through various of its executive agents, servants and employees, has coerced, intimidated, discriminated against and dominated its employees with respect to self-organization, collective bargaining and their right to select representatives of their own choosing with respect to conditions of employment.

The defendant, Newhouse Realty Company, filed an answer in which it denied generally all of the allegations of the complaint above quoted. It likewise filed a demurrer to the complaint alleging in substance that the complaint as a whole and the various paragraphs individually did not allege facts sufficient to constitute a violation of Chapter 55, Laws of Utah, 1937, and further alleged indefiniteness and uncertainty of allegation in each of the paragraphs above quoted.

The matter came on for hearing before the Utah Labor Relations Board on September 9, 1937. Numerous witnesses were examined and the matter was submitted to the Board for determination. On January 18, 1938, findings of fact, conclusions and order were entered by the Board. The findings of fact in substance find that the defendant, Newhouse

Realty Company, did not do any of the things charged in the complaint above quoted.

The Board concluded from its findings that the defendant had not violated any of the provisions of Chapter 55, Laws of Utah, 1937, as alleged in the complaint or in the charge. The Board ordered that the matter and every charge therein contained be dismissed.

In administering the Act, the Board must deal fairly with all parties to the controversy. The decision must find its support in all the evidence. If dismissal is ordered it must be for want of evidence to support the charge. Upon a conflict of evidence, preponderance must be determined. The Board is not at liberty to rely upon part of the evidence in support of its findings and put aside all other undisputed evidence. *Peninsular & Occidental S. S. Company* v. *National Labor Relations Board* (*International Seaman's Union, Intervenor*) 5 Cir., 98 F. 2d 411.

The plaintiff has petitioned this court for a review of the order of the said Board. The final brief herein was submitted to this court on May 15, 1939.

Plaintiff charges that the order made by the Board is erroneous and unlawful and ought to be modified and revised by this court for the reason: That under the evidence before it the Labor Relations Board should have found the Newhouse Realty Company Guilty of unfair labor practices in doing or permitting to be done the following:

(A) Organizing, dominating, and contributing to the support of the Newhouse Hotel Employees' Protective Association, an organization shown by the evidence to be a Company union, (a) by dominating the administration of the said Newhouse Hotel Employees' Protective Association, (b) by encouraging by persuasion and promise of better results and arguing against the joining of a craft union affiliated with the American Federation of Labor, its employees to join and support the said Newhouse Hotel Employees' Protective Association, (c) by attempting to coerce

its employees to join and support the said Newhouse Hotel Employees' Protective Association on penalty of retaliation through loss of employment and loss of wages to accrue from collective bargaining, (d) by interfering with, and attempting to restrain and coerce its employees in the exercise of their right to: 1. form a labor organization of their own affiliated with the American Federation of Labor, 2. to join a labor organization of their own affiliated with the American Federation of Labor, 3. to assist by financial support and by securing membership in a labor organization of their own affiliated with the American Federation of Labor, and, (e) by refusing to bargain collectively with representatives of its employees selected by a majority of said employees in a unit appropriate for such purpose on matters pertaining to wages.

(B) That the said Utah Labor Relations Board should have, under the law and the evidence before it, entered an order against the said defendant company to do and desist from doing the following: (a) That defendant company cease and desist from in any manner interfering with or coercing its employees in the exercise of their rights to organize, form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining for their mutual aid and protection, as guaranteed in Section 8 of the Utah Labor Relations Act, (b) to cease and desist from encouraging membership in the Newhouse Hotel Employees' Protective Association or any other labor organization of its employees, or from discouraging membership in plaintiff or any other labor organization by discrimination in regard to hire and tenure of employment or any term or condition of employment or by threats of such discrimination, (c) to cease and desist from in any manner dominating or interfering with the formation of any labor organization of its employees, from dominating or interfering with the Newhouse Hotel Employees' Protective Association or any other labor organization of its

employees or from contributing financial or other support to the Newhouse Hotel Employees' Protective Association or any other labor organization of its employees, (e) to recognize plaintiff as the representative designated and selected for the purpose of collective bargaining by a majority of the employees in the housekeeping and service department, a unit appropriate for such purposes, and that defendant recognize the plaintiff to be the exclusive bargaining agent and representative of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment, (f) that defendant company withdraw all recognition from the Newhouse Hotel Employees' Protective Association, or by whatever name it is now known, and disestablish said organization as a representative of its employees for the purpose of dealing with defendant concerning grievances, labor disputes, rates of pay, wages, hours of employment, or other conditions of employment, (g) that defendant company post notices in conspicuous places in the Newhouse Hotel in Salt Lake City and County, State of Utah, stating that the Newhouse Hotel Employees' Protective Association, or by whatever name it is now known, is so disestablished, (h) that defendant company refrain in the future from recognizing the Newhouse Hotel Employees' Protective Association, or by whatever name it is now known, as a bargaining agent respecting conditions of employment of defendant's employees, (i) that defendant company be charged with the duty of keeping said notices posted continuously for thirty (30) consecutive days from the day of said posting, (j) notify the Chairman of the Utah Labor Relations Board in writing within ten (10) days of the date of order the steps and proceedings made by defendant company to comply with said order.

The foregoing statement of reasons in the petition is in plaintiff's brief resolved into and framed as a single issue. Stated as generalized, it is as follows:

The issue before the Court in this matter is whether the Labor Relations Board was justified, under the evidence, in finding that the defendant company had not committed any of the acts charged against it in the charge and complaint.

The issue resolves itself around the formation of the Newhouse Hotel Employees' Protective Association. It will, therefore, be necessary to examine the record to ascertain how this organization was initiated and who were the principal organizers, and whether the facts compel a finding contrary to that made by the Utah Labor Relations Board.

In examining the evidence and arriving at our conclusions, we shall be guided by the principles announced and adhered to in the cases cited and referred to as we interpret and understand them. The following forms a part of the elements recently suggested by Judge Clark in the case of *Titan Metal Manufacturing Company et al.* v. *National Labor Relations Board,* decided July 20, 1939, 3 Cir., 106 F. 2d 254. As an appendix to the test of the opinion by Judge Clark, Circuit Judge of the United States Circuit Court of Appeals, Third Circuit, appears a comprehensive schedule of suggestions or summarized statements indicating items that may go into the consideration of an analysis as to whether or not there was "interference, restraint, or coercion" on the part of an employer in his conduct in relation to employees, union organization, or generally what is referred to by the statute as "unfair labor practices."

It is to be expected that a law dealing with conflicting elements, and involving human relations—complex and often difficult of determination—as labor relation laws do, and dealing with uncertainties and changing relationships, must be weighted with problems lacking in definiteness.

In the case of the *National Labor Relations Board* v. *Falk Corporation,* 7 Cir., 102 F. 2d 383, 385, the court in the body of the opinion, among other things, said:

"The quantum of proof necessary to sustain a finding by the Board was defined in the recent decision of *National Labor Relations Board,*

*Petitioner*, v. *Columbian Enameling & Stamping Co., Inc., Respondent,* [306 U. S. 292] 59 S. Ct. 501, 83 L. Ed. [660], decided February 27, 1939. There, it was said:

" 'Section 10 (e) of the Act provides: " * * * The findings of the Board as to the facts, if supported by evidence, shall be conclusive." But as has often been pointed out, this, as in the case of other findings by administrative bodies, means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. * * * Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Consolidated Edison Co. of New York* v. *National Labor Relations Board,* supra [305 U. S. 197], 59 S. Ct. (206) 217 (83 L. Ed. [126]), and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.'

"The pronouncement of the test to be applied by a reviewing court to ascertain whether a finding by the National Labor Relations Board 'is supported by the evidence' appears in another late case, decided December 5, 1938, *Consolidated Edison Co. of New York* v. *National Labor Relations Board* [305 U. S. 197], 59 S. Ct. 206, 216, 83 L. Ed. [126]. There, the court said:

" '* * * The companies contend that the Circuit Court of Appeals (2 Cir., 95 F. 2d 390) misconceived its power to review the findings and, instead of searching the record to see if they were sustained by "substantial" evidence, merely considered whether the record was "wholly barren of evidence" to support them. We agree that the statute, in providing that "the findings of the Board as to the facts, if supported by evidence, shall be conclusive," section 10 (e), 29 U. S. C. A. § 160 (e), means supported by substantial evidence. *Washington, Virginia & Maryland Coach Co.* v. *National Labor Relations Board,* 301 U. S. 142, 147, 57 S. Ct. 648, 650, 81 L. Ed. 965. Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Appalachian Electric Power Co.* v. *National Labor Relations Board,* 4 Cir., 93 F. 2d 985, 989; *National Labor Relations Board* v. *Thompson Products,* 6 Cir., 97 F. 2d 13, 15; *Ballston-Stillwater Knitting Co.* v. *National Labor Relations Board,* 2 Cir., 98 F. 2d 758, 760. We do not think that the Circuit Court of Appeals intended to apply a different test. In saying that the record was not "wholly barren of evidence" to sustain the finding of discrimination, we think that the court referred to substantial evidence. *Ballston-Stillwater Knitting Co.* v. *National Labor Relations Board,* supra.' "

What is substantial evidence sufficient to support a charge of "interference," "restraint," "coercion," or "domination" is a judicial matter.

The provisions of Chapter 55, Laws of Utah, 1937, Section 8, paragraphs (1, 2 and 3) of Section 9 and Section 10 are those provisions alleged to have been violated. We quote also Section 11, paragraphs (a, b, c, d, e, f, and g).

"Section 8. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection.

"Section 9. It shall be an unfair labor practice for an employer— (1) to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 8.

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; provided, that subject to rules and regulations made and published by the board pursuant to section 7 (a) an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay.

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization; provided, that nothing in this act shall preclude an employer from making an agreement with a labor organization (not established, maintained or assisted by any action defined in this act as an unfair labor practice) to require as a condition of employment, membership therein, if such labor organization is the representative of the employees as provided in section 10, (a), in the appropriate collective bargaining unit covered by such agreement when made.

"(4) To discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this act.

"(5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 10(a).

"Section 10. (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment; provided, that any individual employee or a group of employees shall have the right at any time to present grievances to their employer.

"(b) The board shall decide in each case whether, in order to insure to employees the full benefit of their right to self-organization and to collective bargaining, and otherwise to effectuate the policies of this act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof.

"(c) Whenever a question affecting intrastate commerce or the orderly operation of industry arises concerning the representation of employees, the board may investigate such controversy and certify to the parties, in writing, the name or names of the representatives that have been designated or selected. In any such investigation, the board shall provide for an appropriate hearing upon due notice, either in conjunction with a proceeding under section 11 or otherwise, and may take a secret ballot of employees, or utilize any other suitable method to ascertain such representatives.

"(d) Whenever an order of the board made pursuant to section 11 (c) is based in whole or in part upon facts certified following an investigation pursuant to subsection (c) of this section, and there is a petition for the enforcement or review of such order, such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed under subsections 11 (e) or 11 (f), and thereupon the decree of the court enforcing, modifying, or setting aside in whole or in part the order of the board shall be made and entered upon the pleadings, testimony and proceedings set forth in such transcript.

"Section 11. (a) The board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 9) affecting intrastate commerce or the orderly operation of industry. This power shall be exclusive, and shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, code, law or otherwise.

"(b) Whenever it is charged that any person has engaged in or is engaged in any such unfair labor practice, the board, or any agent or agency designated by the board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the board or a member thereof, or before a designated agent or agency at a place therein fixed, not less than five days after the serving of said complaint. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the board in its discretion at any time prior to the issuance of an order based thereon. The person so complained of shall have the right to file an answer to the original or amended complaint and to appear in person or otherwise and give testimony at the place and time fixed in the com-

plaint. In the discretion of the member, agent or agency conducting the hearing or the board, any other person may be allowed to intervene in the said proceeding and to present testimony. In any such proceeding the rules of evidence prevailing in courts of law or equity shall not be controlling.

"(c) The testimony taken by such member, agent, or agency or the board shall be reduced to writing and filed with the board. Thereafter in its discretion, the board upon notice may take further testimony or hear argument. If upon all the testimony taken the board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the board shall state its findings of fact and shall issue and cause to be served on such person an order to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this act. Such order may further require such person to make reports from time to time showing the extent to which it has complied with the order. If upon all the testimony taken the board shall be of the opinion that no person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the board shall state its findings of fact and shall issue an order dismissing the said complaint.

"(d) Until a transcript of the record in a case shall have been filed in a court, as hereinafter provided, the board may at any time, upon reasonable notice and in such manner as it may deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it.

"(e) The board shall have power to petition the supreme court of Utah (wherein the unfair labor practice in question occurred or wherein such person resides or transacts business) for the enforcement of such order and for appropriate temporary relief or restraining order, and shall certify and file in the court a transcript of the entire record in the proceeding, including the pleadings and testimony upon which such order was entered and the findings and order of the board. Upon such filing, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter upon the pleadings, testimony, and proceedings set forth in such transcript a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the board. No objection that has not been urged before the board, its member, agent or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be

excused because of extraordinary circumstances. The findings of the board as to the facts, if supported by evidence, shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the board, its member, agent or agency, the court may order such additional evidence to be taken before the board, its member, agent or agency, and to be made part of the transcript. The board may modify its findings as to the facts, or make new findings, by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which, if supported by evidence, shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. The jurisdiction of the state supreme court shall be exclusive and its judgment and decree shall be final.

"(f) Any person aggrieved by a final order, the board granting or denying in whole or in part the relief sought, may obtain a review of such order in the supreme court of Utah by filing in such court a written petition praying that the order of the board be modified or set aside. A copy of such petition shall be forthwith served upon the board, and thereupon the aggrieved party shall file in the court a transcript of the entire record in the proceeding, certified by the board, including the pleading and testimony upon which the order complained of was entered and the findings and order of the board. Upon such filing, the court shall proceed in the same manner as in the case of an application by the board under subsection (e), and shall have the same exclusive jurisdiction to grant to the board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the board; and the findings of the board as to the facts, if supported by evidence, shall in like manner be conclusive.

"(g) The commencement of proceedings under subsection (e) or (f) of this section shall not, unless specifically ordered by the court, operate as a stay of the board's order."

Chapter 55, Laws of Utah 1937, declares, after a preamble, the legislative policy as to labor relations as follows:

"It is hereby declared to be the policy of the state of Utah to eliminate the causes of certain substantial obstructions to the free operation of industry and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and pro-

cedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating terms and conditions of their employment or other mutual aid or protection." Section 2.

From the sections quoted, it appears that neutrality, as nearly as it may possibly exist in human affairs, is attempted to be imposed upon the employer by the statute. The right of the employee to self-organization, to the form of union to which he may belong whether he join one union, or another, organize his own or belong to no union at all is left to his discretion. In addition to the statutory inhibitions "interference," "restraint," "coercion," and "domination" imposed upon the employer there shall be no contribution of financial aid or other support to a labor organization. However, under rules and regulations published by the Labor Relations Board, an employer shall not be prohibited from permitting employees to confer with him during working hours, without loss of time or pay.

The following statements fairly reflect the evidence. They may be more detailed than necessary. There may be some repititions in applying the evidence to pertinent cases. It is done for the reasons heretofore stated.

Late in May or early in June, Mrs. Florence Pendleton (Miss Allgood), head housekeeper in charge of all employees from the mezzanine floor to the twelfth floor of the hotel, who has the power to hire and fire in her department, told Miss Kolstead, the assistant housekeeper that she would like to see all the maids after working hours. They met in a large linen room and there she stated:

"Girls, I feel kind of bad. There is a feeling that is not right around here. * * * I don't know what it is. We are reading in the papers all the time all these terrible things, these here union activities, the papers are full of it. The whole country is at unrest. I do wish girls, that we would try to continue and go on in the nice, peaceable manner that we have gone on all these years. I understand it is more money that you feel like you are entitled to. I feel the same way and I am going to try to go to the management and see if I can't get a raise

for you. (* * * at the time I did not know if there were one, twelve or eighteen who belonged to the union). If you do join the union that is all right. (One girl spoke up and said, 'If we do join, you can't fire us'.) I don't want to fire you. The next day after this talk I went into their lunch room at noon and told them I had accomplished getting them an increase. I said, 'Let's all get together and be just like one big family and work for the interests of the house.' I said 'No girls, if any of you have joined the union it is not going to make any difference.' Attention was directed to the millions of dollars that were going into the hands of the heads of unions every day. I did not encourage them to join the American Federation of Labor and did not discourage them. There was no discussion of unions with Mrs. Waters when the raise for the maids was discussed with her and it was not given with any idea of arresting the American Federation of Labor."

As to whether certain individuals had been discharged due to union affiliations, Mrs. Pendleton testified: Thelma Christensen quit and was not discharged. Fern Moriarty quit and went to California and was not discharged. Ella Tatton refused to sweep and make beds on the mezzanine floor and was fired. Kate Warrum was on leave due to ill health, she was not discharged and her position still awaits her. Elizabeth Holbrook stated she had worked long enough and that her husband had a good job. Florence Stoker quit to go east and the defendant let her go ten days before her resigning date was to take effect because if they did not there were steady girls waiting for the job who had returned from vacations and they wanted to take them back while the girls were free to come back. Bella Maynard, newly hired, was let out when the older girls returned from their vacations. Anna Barney was given leave to take care of an ailing husband.

Mrs. Pendleton was requested by Mrs. Jensen (Mrs. Rosvall) to instruct her as to what she might do to enable her to attend a meeting of the employees at which unions were to be considered in that it was to be held during the time she was supposed to be on duty. Mrs. Pendleton went to Mrs. Jensen's desk and cared for it while she attended the meeting.

The act of Mrs. Pendleton taking over the desk of Mrs. Jensen might be susceptible of the implication of aiding the inside union or equally it might be interpreted as an act aiding the employees to exercise their own discretion. It might have been neutrality showing that they did not want to hinder them in what they wanted to do. If they had kept people from attending the meetings they might have been interfering. By making it possible for them to attend they are charged with interfering. We cannot construe it as interference in this case and upon that issue we agree with the Board's decision. There is nothing to show at that time that Mrs. Jensen would agree or disagree with what was to go on at the meeting.

A similar charge was made against the Union Pacific Stages, Inc. Mr. Walsh, president of the company, said to some of the assembled bus drivers that as long as the company made money to pay the wages, they would be given to the men, and that it was a matter that the union had nothing to do with and that in so far as treatment to be given the men was concerned, they would be treated just the same regardless of this union, that they didn't need a union to safeguard any of their rights and further stated that they didn't need to pay tribute in to the union if they didn't want to. The drivers at the time were agitating for more wages and the union was attempting to organize the men to obtain this raise. *National Labor Relations Board* v. *Union Pacific Stages, Inc.*, 9 Cir., 99 F. 2d 153.

It is charged by the plaintiff that "Mrs. Pendleton had absolutely no right to convene the maids in a meeting when she knew that an outside independent union was attempting to organize the help and tell the maids they were underpaid and that she would get them a raise in wages and at such meetings [and there was but one, except ■ to inform them that she had procured the raise] talk about strikes, labor conditions," etc. and that "This kind of conduct on the part of one of the supervisors of the hotel management is expressly outlawed by the statute."

We fail to find where such conduct or similar conduct is "expressly outlawed" by the statute.

In the aforementioned case of National Labor Relations Board v. Union Pacific Stages, Inc., one of the drivers testified that Walsh said, "The Union had no bearing on the men getting this raise, that he was doing it voluntarily" and "that the men didn't have to belong to any union; if they didn't want to belong to any union, they would still have their jobs."

Manning, the company general superintendent, upon being advised of the temper of the minds of the employees called the bus drivers together and told them that "he didn't want anyone that was not satisfied," and relative to an individual case (Auld), stated that "the union could not get him anything that the company could not give him" and then proceeded to settle a matter of wages which the union had attempted to settle, with the man personally. The court ruled that "the Board was in error when it held that the declarations of Walsh in announcing that the company had voluntarily raised the pay of its driver employees, and Manning's adjudgment of the Auld matter constituted "interference with the rights of employees'." *National Labor Relations Board* v. *Union Pacific Stages, Inc.*, 9 Cir., 99 F. 2d 153, 162, 163.

We conclude, therefore, that the acts of Mrs. Pendleton prior to the time that the organization of the inside union was contemplated do not constitute as a matter of law interference with the rights of the employees to choose their own bargaining agent or cannot be construed as aiding the organization of an inside union. The act protects the employees from interference and they were specifically told that if they did or had joined the outside union that "joining a union would make no difference."

The evidence shows that there has been no discrimination as to those dropped from the register. The only witness (Dorothy Devine) protesting that she had been discriminated against was a member of the inside union and the

complaint charges that the defendant was discriminating against the outside union members.

The contention that employees had been fired because of union activities was abandoned by the outside union (plaintiff) after the investigators found the defendant had acted properly and the Board ruled that such finding was supported by the evidence.

Mr. A. W. Shepherd is the superintendent of service of the Newhouse Hotel. He has been with the company fourteen years and has held his present position five years. He is in charge of the bell hops and elevator girls. Mr. Holman Waters, assistant manager, is his superior. He is not an officer of the hotel, but does have the authority to hire and fire in his department.

Mr. Frank Reese is bell hop captain and has been with the hotel some ten years. Mr. V. P. Christensen has the same position and duties as Mr. Reese on alternating shifts. Neither of them have the authority to hire or fire and they merely report infractions of the rules without recommendations. When Mr. Shepherd moved up into his present position the others moved into theirs. They have worked together for some eleven years and there is evidence of a harmony of action between them.

The travelers from the west coast passing through the hotel and the newspapers had recounted stories of the serious labor strife on the coast. The idea was developed between Mr. Reese and Mr. Shepherd that it might be well to have an employees' association in the hotel. They found that a number of other business establishments had such organizations. The situation that appealed to them was that if there were any difficulties they could bring them to the attention of the management more satisfactorily through one of their own bargainers. They had been informed that a group of employees of one hotel had gone out on a strike and that the whole hotel was stopped because a few had left. They did not want this to happen to them and they felt there would be security in having all the employees in

one union. They talked it over with Mr. H. B. Eliason, who started in the hotel in 1930 as a night clerk and has now attained the position of chief clerk. His duties are to room the guests and answer the telephone. He is not in charge of the office and does not have the authority to hire or fire. The title of chief clerk goes to the oldest in the office in point of service.

They concluded to ascertain what the wishes of the employees were. They testified that the management had nothing to do with stimulating the idea, conceiving the idea, or in proposing that they organize. Their desire was a personal one of protecting themselves as employees and not with any idea of doing it for the hotel although it might be benefited thereby.

Mr. Shepherd and Mr. Eliason went to Mr. Douglas Beatie, an attorney in close proximity to the hotel, and asked him to aid them in organizing as they wanted to do it properly. He requested information as to when the best time would be to have all the employees there, when there would be few who would have to be working or who could not get there. Three o'clock in the afternoon was set as the time as shifts change and fewer people are working. Mr. Beatie made arrangements with the hotel to hire the ball room and advised of the meeting.

Was the instigating or beginning of this employee's organization in this manner the act of the employer?

There is nothing in the evidence from which an inference can be drawn that the executives or the management knew about this proposed organization. The doctrine of respondeat superior has been applied against the management where supervisory employees have taken part in the organization of an inside union even though it had no actual participation therein. *National Labor Relations Board* v. *A. S. Abell Co.*, 4 Cir., 97 F. 2d 951, 956.

However, the Board, in the instant case, had evidence from which it could find and did find that these men were not acting in their capacities as officers of the company but

were acting in their own behalf to protect their own positions and others. It appears that they were acting not with fear of the management but with the view of preventing strife. This could not be construed as acting in behalf of the management and all testified that they exercised their own judgment and did as they chose in relation to unions.

The Supreme Court of the United States in construing the phrase "if supported by evidence," which is the same phrase used in the Utah Labor Relations Act, indicated that whether the recognition of an employees' association would be a continuing obstacle to the exercise of the employees' right of self-organization and collective bargaining through representatives of their own choosing was an inference of fact. *National Labor Relations Board* v. *Pennsylvania Greyhound Lines Co.,* 303 U. S. 261, 58 S. Ct. 571, 82 L. Ed. 831, 115 A. L. R. 307.

The testimony is impressed with some evidence of hard hearing and misunderstanding which resulted in some conflict. Leona Rosvall (Mrs. Jensen) who started her services in the hotel as assistant in the linen room in 1929 and became head of such room in 1932 is charged by one of the maids with saying the maids were "compelled" to attend the meeting, another said the word "supposed" was used and another "requested." Some thought their jobs were threatened, most did not hear such words, and Mrs. Jensen testified that she expressed herself as she would "like" to have them all there as they were employees. Counsel for the plaintiff contend, "It is uncontradicted that Mrs. Rosvall * * * told the girls (maids) in no uncertain terms that they were supposed to attend the meeting to organize the house union." Gladys Hill, witness for the plaintiff, testified that "she, Mrs. Jensen, didn't say you had to go, she just said there was a meeting at three o'clock." Mrs. Jensen further stated, "I don't think I used the words had to be." The linen girls asked, "Are we supposed to go?" and she replied "Yes, you are supposed to go, too. You are one of the employees" and stated that she did not say "any-

thing to them at any time in connection with these meetings that if they didn't go their jobs would be in jeopardy."

Prior to the meeting Mr. Shepherd, Mr. Reese and Mr. Eliason suggested that it would be well to have Mr. J. F. Ballif, Jr., preside. He had had experience in conducting meetings, having been a bank examiner and a government employee in the forestry service. Mr. Ballif is the auditor of the defendant, cannot "hire or fire," has no employees under him, has no particular interest in unions, named as the "paymaster" by the plaintiff, in fact passes out the money to the employees as they come to the window about half the time and the secretary to Mr. West passes it out the other half and upon being requested to preside told them he would think it over before he decided what he wanted to do. He accepted later but decided for himself as to whether or not he wanted to do anything about it and it was not at the suggestion of the management.

Mr. Ballif introduced Mr. Beatie who read to those assembled the "Little Wagner Act," explained to the employees their rights as he understood them. He told them that they were free to join any union they desired, that it was a matter of free will, and explained the general purposes of the employees' association. They received 104 names on a petition that was passed. One is questioned, in that she had already signed up with the outside union. One later joined (McLean) who was away on vacation. Forty-one belonged to the American Federation of Labor.

Mr. Beatie explained that this was an association purely of employees, and that they were to exercise their own free will and choice and that no one could harm them for whatever they might do in so far as organizing was concerned.

Upon ascertaining the numbers favoring a house association, the second meeting was called the next day and the articles of incorporation and by-laws were read and adopted. Everyone was invited to these meetings. American Federation of Labor members, those desiring to join and those not desiring. Everyone could attend that wanted to. The mes-

sage was again spread around by word of mouth. Members of the other unions, however, were excluded from becoming members of the association and from voting. The organization elected directors, one from each department and two at large from the hotel. This board was to be the governing body of the organization. Bargaining agents were then elected for each department to represent members of the association. A majority of one department, maids, etc., belonged to the American Federation of Labor.

Upon the question as to whether or not this department may have its own bargaining agent the statute reads, Section 10 (b) :

"The board shall decide in each case whether, in order to insure to employees the full benefit of their right to self-organization and to collective bargaining, and otherwise to effectuate the policies of this act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof."

The determination of whether or not this group may have a bargaining agent of their own is a matter not before the court.

The findings of fact of the Utah Labor Relations Board, relative to the issues involved, are:

"III. That Respondent has not told and instructed its employees in substance and effect, or in any manner at all, at various times since the first day of July, 1937, and down to the time of the filing of the Complaint in the above entitled matter, or at any time, that they should cease any contemplated or actual affiliation with any outside labor union, and especially Complainant or that if any of said employees had joined any outside labor union including Complainant, that such employees should immediately refrain therefrom.

"IV. That Respondent has not at various times since the first day of July, 1937 in any manner, or at any time, told and informed its employees that they would be fired and discharged if they joined any outside labor organization or that if said employees engaged in a strike they would permanently lose their positions and jobs, and that there was no law to compel Respondent to re-employ said employees in the event of a strike, or that a strike would permanently sever any employment connections whatsoever between Respondent and its

said employees; and, moreover, Respondent has not told or informed its employees at any time or in any manner that if said employees would engage in a concerted effort to form a so-called Company Union whose personnel should be made up exclusively of Respondent's employees, then, and in that event, the salaries of said employees would be raised and other conditions of employment bettered.

"V. That Respondent has not at various times previous to the first day of August, 1937, or at any time, or in any manner, refused to negotiate and bargain collectively with Complainant as the duly authorized and appointed bargaining agent of Respondent's employees in the unit by the Utah Labor Relations Board determined and designated as appropriate for collective bargaining purposes.

"VI. That Respondent has not by and through various of Respondent's agents, servants, and employees, or in any manner at all, on or about the 10th day of July, 1937, or at various times thereafter, or at any time, told and informed its employees in substance and effect, or at all, that it would be to the best interest of said employees for them to organize a so-called Company-Union composed exclusively of Respondent's employees, and, moreover, a so-called company union was not organized on the premises of Respondent on or about the 21st day of July, 1937, under the name and style of 'Newhouse Protective Association' in consequence of the activity, suggestions and instructions of Respondent at all; and still further Respondent has not contributed to, or in any manner interfered with or dominated the organization of said so-called Company Union.

"VII. That the Respondent has not at various times ever since the 10th day of July, 1937, down to the time of filing of Complaint in the above entitled matter, or at any time, by or through various of its executive agents, servants or employees, or any persons whatsoever, coerced, intimidated, discriminated against or dominated its employees with respect to self-organization, collective bargaining or their right to select representatives of their own choosing with respect to conditions or employment.

"VIII. That Respondent has not at any time, or in any manner interfered with or discriminated against, coerced, or intimidated its employees with respect to self-organization, collective bargaining, or their rights to select representatives of their own choosing with regard to rates of pay, wages, hours of employment or other conditions of employment."

The plaintiff petitioned this court for a review of the order of the Utah Labor Relations Board upon the grounds that (1) under the evidence the defendant was guilty of unfair practices in doing or permitting to be done certain acts

charged; and (2) the said Utah Labor Relations Board should have, under the law and the evidence, entered an order against the defendant to do and to desist from doing certain acts hereinafter considered.

As hereinbefore indicated in the extended statutory quotation, Chapter 55, Section 11 (e), Laws of ■ Utah 1937, provides:

"The findings of the board as to the facts, if supported by evidence, shall be conclusive."

But the courts have not construed this language as compelling the acceptance of findings arrived at by accepting part of the evidence and totally disregarding other convincing evidence.

"We are bound by the Board's findings of fact as to matters within its jurisdiction, where the findings are supported by substantial evidence; but we are not bound by findings which are not so supported." *Appalachian Electric Power Co.* v. *National Labor Relations Board,* 4 Cir., 93 F. 2d 985, 989; *Washington, Virginia & Maryland Coach Co.* v. *National Labor Relations Board,* 301 U. S. 142, ■ 57 S. Ct. 648, 81 L. Ed. 965; *Cupples Company Manufacturers* v. *National Labor Relations Board and Mutual Relations Association,* 8 Cir., August 1, 1939, 106 F. 2d 100. Substantial evidence is evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences. *Pennsylvania Railroad Co.* v. *Chamberlain,* 288 U. S. 333, 339, 343, 53 S. Ct. 391, 77 L. Ed. 819; *Appalachian Electric Power Co.* v. *National Labor Relations Board,* 4 Cir., 93 F. 2d 985, 989.

" 'Substantial evidence' means more than a mere scintilla. It is of substantial and relevant consequence and excludes vague, uncertain, or irrelevant matter. It implies a quality of proof which induces conviction and makes an impression on reason. It means that the one

weighing the evidence takes into consideration all the facts presented to him and all reasonable inferences, deductions and conclusions to be drawn therefrom, and, considering them in their entirety and relation to each other, arrives at a fixed conviction." *National Labor Relations Board* v. *Union Pacific Stages, Inc.,* 9 Cir., 99 F. 2d 153, 177. "The rule of substantial evidence is one of fundamental importance and is the dividing line between law and arbitrary power." *National Labor Relations Board* v. *Thompson Products, Inc.,* 6 Cir., 97 F. 2d 13, 15.

Counsel for plaintiff contends that "The Board not being a court, but for the most part a fact finding commission * * * its findings here must be based on and supported by competent, material and relevant evidence." With the doctrine as thus quoted we think the authorities ▮▮▮ are in accord. Counsel further says,

"Since there is nothing in the statute indicating any intention to modify or change the rules of evidence prevailing in courts of law or equity, those rules are controlling in this court."

Section 11 (b) of Chapter 55, supra, provides:

"In any such proceeding the rules of evidence prevailing in courts of law or equity shall not be controlling."

No one should be better advised than counsel that there was no guide or rule applied during this hearing as to what evidence should be admitted or rejected. The obvious purpose of this and similar provisions is to free administrative boards from the compulsion of technical rules so that the mere admission of matter which would be deemed incompetent in judicial proceedings, particularly in jury cases, would not invalidate the administrative order. *Interstate Commerce Commission* v. *Baird,* 194 U. S. 25, 24 S. Ct. 563, 48 L. Ed. 860; *Interstate Commerce Commission* v. *Louisville & N. R. Co.,* 227 U. S. 88, 93, 33 S. Ct. 185, 57 L. Ed. 431. But this assurance of a desirable flexibility in administrative procedure does not go so far as to justify an order without a basis in evidence having rational probative force. Mere uncorroborated hearsay or rumor does not

constitute substantial evidence. *Consolidated Edison Co.* v. *National Labor Relations Board,* 305 U. S. 197, 59 S. Ct. 206, 83 L. Ed. 126, 131, 141. Hearsay and non-expert opinion evidence may not be used as a basis to support the findings of the Board upon which rests an order sought to be enforced. *National Labor Relations Board* v. *Bell Oil & Gas Co.,* 5 Cir., 98 F. 2d 406, 409. While technical rules of evidence which thwart justice should be abolished, it would be impossible for courts to function if all limitations upon the scope of evidence were removed. To stop needless delays, expedite business, and keep prejudice from creeping into the trial, it is necessary for courts to stay within the bounds of relevancy. Fair rules of evidence are essential in the judicial hearing. Without them, the proceeding is more or less of an inquisition. *National Labor Relations Board* v. *Bell Oil & Gas Company,* supra.

Counsel for plaintiff, in his reply brief, states, "There is 'interference' under the law even though not a single employee considers himself coerced or intimidated in joining or not joining any particular organization."

The Supreme Court of the United States in construing the meaning of the terms "influence" and "coercion" in the Railway Labor Act, 44 Stat. 577, 45 U. S. C. A. § 152, subd. Third, from which the more recent labor acts were taken states:

"The intent of Congress is clear with respect to the sort of conduct that is prohibited. 'Interference' with freedom of action and 'coercion' refer to well-understood concepts of the law. The meaning of the word 'influence' in this clause may be gathered from the context. Noscitur a sociis. *Virginia* v. *Tennessee,* 148 U. S. 503, 519, 13 S. Ct. 728, 37 L. Ed. 537 [543]. The use of the word is not to be taken as interdicting the normal relations and innocent communications which are a part of all friendly intercourse, albeit between employer and employee. 'Influence' in this context plainly means pressure, the use of the authority or power of either party to induce action by the other in derogation of what the statute calls 'self-organization.' The phrase covers the abuse of relation or opportunity so as to corrupt or override the will, and it is no more difficult to appraise conduct of this sort in connection with the selection of representatives for the pur-

poses of this act than in relation to well-known applications of the law with respect to fraud, duress, and undue influence." *Texas & New Orleans Railroad Company* v. *Brotherhood Ry. & S. S. Clerks*, 281 U. S. 548, 50 S. Ct. 427, 433, 74 L. Ed. [1034] 1035.

On the expression of opinion Mr. J. Warren Madden, Chairman of the National Labor Relations Board, stated at the hearing before the Senate Committee on Education and Labor (April 18 and 19, 1939) inter alia:

"In the first place I wish to emphasize that there is no issue here of the employer's constitutional right to freedom of speech. The constitutional right to freedom of speech is, of course, applicable to the Act as it now stands. If any provision of the Act, or any action of the Board, infringes upon that guarantee we may presume that the courts will outlaw the provision or overrule the Board to the extent necessary to bring conformity with the Constitution. The proposed amendment, therefore, is not necessary to assure protection of the employer's freedom of speech.

"In the second place I wish to make clear that nothing in the Act or in any decision of the Board, forbids expressions of opinion by employers which do not interfere with, restrain, or coerce employees in their rights to self-organization. As the Supreme Court has pointed out in connection with the Railway Labor Act, 'normal relations and innocent communications * * * between employers and employees' are not prohibited. Only where an expression of opinion substantially impairs freedom of self-organization does it become an unfair labor practice. It must be remembered throughout that we are dealing only with 'expressions of opinion' that have such an effect."

While this expression of opinion is not authority in the construction of the Act, or otherwise, it is interesting and gives a sidelight as to the opinion of one charged with the responsibility of the position held by its author.

Finally counsel contend:

"It is further uncontradicted that Harrison Sanders [a supervisor], who had charge of the waiters and the right to hire and fire * * *"

was instrumental in promoting the inside union. The evidence shows that the power of Mr. Sanders was discussed and in questioning Mr. West, manager of the Newhouse Hotel, he stated

"a supervisor is an employee, has no more authority than an employee, has no other authority than the witness [Stella White] when it comes to influencing employees."

This loose manner of stating facts and claiming inferences makes it difficult to ascertain the true issues. In this case much hearsay testimony was received without any requirement of actual corroboration where direct testimony would seem to have been available; leading questions by counsel were permitted on the most vital issues whereby the very answer desired was put into the mouth of the witness.

The charge that union activities were going on, on the premises, is like the stove charging that the kettle is black. From the evidence, one might conclude that when one employee met another, unions were the subject of discussion.

Gladys Hill, a witness for plaintiff, was presented to show that it had been threatened that "she would be laid off next" if she became affiliated with the American Federation of Labor. Upon cross examination it was shown she was already a member of the American Federation of Labor, was still in the employ of the plaintiff and that those that had told her of such threats were other members of the plaintiff, the union to which she belonged.

The charge that those contemplating going on a strike would be cutting themselves off the payroll and that the company would not be under any obligations to take them back were by the findings of the Board statements of opinion and were not the expressions of the defendant.

It is charged that some of the bargaining agents are supervisory officers of the defendant. A committee chosen from employees' superiors has been held not an appropriate agency for collective bargaining even though the men voted for their superiors in employment to represent them. *National Labor Relations Board* v. *Pennsylvania Greyhound Lines*, 303 U. S. 261, 58 S. Ct. 571, 82 L. Ed. 831, 115 A. L. R. 307. In that case there was evidence to support the fact that the company had been instrumental in the organization prior to the adoption of the National

Labor Act, 29 U. S. C. A. § 151 et seq. In the instant case, the Board found them to be satisfactory and the employees selected them to be their representatives and it is to be presumed that they must be satisfied with their own elected agents, therefore there seems to be no occasion for the court to attempt to substitute its judgment for that of the Board or the selections made by the bargaining unit. Act does not limit employees to whom they may choose or may not choose as their bargaining agents. *Cupples Company Manufacturers* v. *National Labor Relations Board and Mutual Relations Association,* supra.

The charge is also made that the supervisory employees are prohibited from becoming members of the union, that some of the employees in this inside union would not be eligible for membership in the American Federation of Labor and that through such employee the management speaks and employees are interfered with, intimidated and coerced when such employees solicit their membership in an inside union. The courts have ruled that employees holding supervisory positions may not aid or encourage the formation of an inside union. *Virginia Ferry Corporation* v. *National Labor Relations Board,* 4 Cir., 101 F. 2d 103; *Virginia Railway Co.* v. *System Federation No.* 40, 4 Cir., 84 F. 2d 641; *National Labor Relations Board* v. *Pennsylvania Greyhound Lines,* supra.

Courts, however, have construed this similar to the construction made by the Supreme Court in the case of *Texas & New Orleans Railroad Company* v. *Brotherhood Ry. & S. S. Clerks,* supra, and stated:

"While it is true that employer leadership through supervisory employees is condemned by the Act, and that pressure overriding the will of the employees, as a means of encouraging or discouraging membership in any labor organization, constitutes interference with a worker's right to select his representative, it does not follow that the mere showing of a preference and acts of cooperation constitute interference with an employee in his exercise of the rights guaranteed under the Act." *Jefferson Electric Co.* v. *National Labor Relations Board,* 7 Cir., March 31, 1939, 102 F. 2d 949, 956. *Cupples Company*

*Manufacturers* v. *National Labor Relations Board and Mutual Relations Association,* supra.

A case somewhat analogous in some of its aspects to the instant case but somewhat stronger in its implications of interference is the recent case of *Cudahy Packing Co.* v. *National Labor Relations Board,* 8 Cir., 102 F. 2d 745, 751, decided March 9, 1939. After outlining the evidence, as the court said, "in the aspect most favorable to the Board—very much of the evidence thus favorable was sharply disputed" the court summarized the evidence as follows:

"The independent union is, in form and capabilities, a labor organization. Organization of it was conceived and initiated by the workmen themselves. The influence of the management was present in the campaign for membership. There was a form of a cooperation by the management in perfecting the organization in that the committee was permitted to have the articles of association signed in the plant cafeteria during working hours and the men allowed to leave work and go to the cafeteria for that purpose—all without loss of pay. Since complete organization of the independent union, the only real evidence of any influence whatsoever of the management in the independent union are the statements * * * attributed to Ross by Foldenauer."

These statements related to a conversation between Ross and Foldenauer in which Foldenauer referred to Ross as having said. "Don't let Mr. Foster [plant manager] see you in here talking to me, because I got hell for talking to you guys once before."

This occurred after the independent union was organized. During the proceedings of organization Foster was invited to one of the meetings. On the occasion he told "the men there was nothing he could do to encourage or discourage them."

Quoting further the court said:

"While the evidence, by no means, shows any flagrant interference, much less coercion of employes in the formation or maintenance of the independent union, yet we cannot say there is not some, even though small, substantial evidence of company influence in the course

of the organization and in the continued activities of this union. However, it does seem clear from the evidence that this company influence was relatively slight and that the situation here is quite different from the aggravated company action and coercion revealed in some cases, such as *National Labor Relations Board* v. *Pacific Greyhound Lines*, 303 U. S. 272, 58 S. Ct. 577, 82 L. Ed. 838, and *National Labor Relations Board* v. *Pennsylvania Greyhound Lines*, 303 U. S. 261, 58 S. Ct. 571, 82 L. Ed. 831, 115 A. L. R. 307. There is enough evidence to sustain the order of the Board, in so far as the 'cease and desist' provisions are involved."

There is then a discussion as to the meaning of the expression "completely disestablish." It appears from the discussion from which the foregoing is taken that had the Board found no violation the decision would probably have been supported by the court. The court further said:

"The evidence here shows a very large degree of independence in the employes in initiating, organizing and administering this independent union."

In the instant case matters had hardly gone beyond the organizing stage. There was no management interference, no restraint on the part of any one and no coercion as to organization. It is not claimed that there has been domination of the house union by anyone. There was no management or other domination of any individual. The employees in the organization procedure, as shown by the evidence and found by the Board, exercised complete independence in initiating the organization.

The employees in the instant case were acting in their own behalf and in their own interest, or in their own interest coupled with the interest of the company, and unless there is interference, restraint or coercion in the form of pressure, as suggested in the Supreme Court case and in the aforementioned cases, there is no basis for a finding of interference.

The Labor Relations Board found or inferred that the employees were free to act and choose as they saw fit and there was no interference with the right of self-organization

by the defendant. In view of the situation that the board found there was not sufficient evidence to support the charge and that such finding or inference was in accord with the evidence, we do not find the matter to be one of law, fact or inference that should be disturbed.

The record supports the finding of the Board. Its order is therefore affirmed.

LARSON, McDONOUGH, and PRATT, JJ., concur.

WOLFE, Justice (dissenting).

I dissent. I think the case must be sent back to the Board for a finding on the question of whether the conduct of the supervisory employees was "interference" as is meant by the Act. The Board never made a finding on this important and fundamental fact as I shall now point out. Under the case of *Jones* v. *Industrial Commission*, 90 Utah 121, 61 P. 2d 10, such finding is necessary.

With unimportant phrases omitted, the Board found:

"That Respondent has not *told* or *instructed* its employees * * * that they should cease any contemplated or actual affiliation with any outside labor union" or "that if said employees had joined any outside labor union * * * such employees should immediately refrain therefrom"; "that Respondent has not * * * *told* or *informed* its employees that they would be fired or discharged if they joined any outside labor organization or that if said employees engaged in a strike they would permanently lose their positions and jobs, and [has not told or informed the said employees] that there was no law to compel respondent to re-employ said employees in the event of a strike or [has not told or informed the said employees] that a strike would permanently sever any employment connections whatsoever between Respondent and its employees and, moreover, Respondent has not told or informed its employees * * * that if said employees would engage in a concerted effort to form a so-called Company Union whose personnel should be made up exclusively of Respondent's employees, then, and in that event, the salaries of said employees would be raised and other conditions of employment bettered." (Italics added.)

Up to this point the findings simply negative any instruction coming from the management to the supervisory

or any employees to do or not do the acts which the employer is charged by the complaint with having done and which constitute interference. But such finding does not tell the whole story. The cases hold that even though the management did not suggest, direct, initiate, or have anything to do with the conduct of its supervisory employees, yet if the conduct of said employees is such as to constitute "interference," as that term is used in the Act, the employer is nevertheless responsible for their conduct on the theory of respondeat superior.

As to supervisory employees with the right to hire and fire, the principal must be held responsible for their activities in the sense that the order may be made operative on the employer. Van Dusen, "What is Employer Domination or Support?" 13 Temple University Law Quarterly 63, 101; *National Labor Relations Board* v. *A. S. Abell Co.*, 4 Cir., 97 F. 2d 951, 956; *Cupples Company Mfgrs.* v. *National Labor Relations Board*, 8 Cir., 106 F. 2d 100, 4 Lab. Rel. 898, 906; *Virginia Ferry Corp.* v. *National Labor Relations Board*, 4 Cir., 101 F. 2d 103, 106; *Hamilton-Brown Shoe Co.* v. *National Labor Relations Board*, 8 Cir., 104 F. 2d 49, 52. And where such employees have power to hire and fire it has been held that their actions were imputable to the company whether the company knew of them or not. *National Labor Relations Board* v. *Abell Co.*, supra; *Ballston-Stillwater K. Co.* v. *National Labor Relations Board*, 2 Cir., 98 F. 2d 758, 761; *Virginia Ferry Corp.* v. *National Labor Relations Board*, supra; *National Labor Relations Board* v. *Planters Mfg. Co.*, 4 Cir., 105 F. 2d 750; *Id.*, 4 Cir., 106 F. 2d 524, 4 Lab. Rel. Rep. 865, 867. In the Abell Case it was said [97 F. 2d 956]:

"Nevertheless there was substantial evidence to show that the superintendent of the press room, who had control of the men in that department with authority to hire and discharge them, made a number of statements from which the men might fairly infer that it was not to their interest to become members of the Union and that they might suffer from such an association. * * * The doctrine of respondeat superior applies and the management must assume responsibility for

the actions of its supervisory official even though it had no actual participation therein."

This principle of respondeat superior is invoked because of the necessities of the case. It would be practically impossible to prove in most cases that the employer set the confidential employees on their course. He could do so with a hint or suggestion. On the other hand, he could easily prevent such activities by a simple rule or instruction. The rank and file cannot prevent the activities—the management can. Such device must be used to save the law from nullification. It is justifiable in order to effectuate the salutary purposes of the Act.

Consequently even though the Board found that the defendant did not direct the supervisory employees to act, it is nevertheless responsible if supervisory employees with authority to hire and fire did indulge in such activity as would, if done at the direction of the management, come within the definition of interference as meant by the Act.

We must, therefore, know, in order to determine whether the defendant is liable under the principle of respondeat superior, whether the acts of such supervisory employees constituted interference as meant by the Act. And there is no finding which gives us this information. In addition to the findings of the Board above set out, I find only the following relating to the questions in issue:

"VII. That the Respondent has not * * * by or through various of its executive agents, servants or employees, or any persons whatsoever, coerced, intimidated, discriminated against or dominated its employees with respect to self-organization, collective bargaining or their right to select representatives of their own choosing with respect to conditions of employment.

"VIII. That Respondent has not * * * in any manner interfered with or discriminated against, coerced, or intimidated its employees with respect to self-organization, collective bargaining, or their rights to select representatives of their own choosing with regard to rates of pay, wages, hours of employment or other conditions of employment."

But we cannot tell from these findings whether they are grounded on and imply a subsidiary finding that the supervisory employees did not engage in activities which could be considered as interference per se, or whether they are grounded on a finding that, even though such activities were interference per se, the employer did not tell or instruct, the supervisory employees to so act. If the first was the basis of findings VII and VIII the employer would not be subject to a cease and desist order. If the second was the basis, the employer would be liable for the acts of the supervisory employees on the principle of respondeat superior even though he had not told or instructed them to so act. We are left to guess in a matter which leads to one decision if we guess one way and to another decision if we guess the other.

The case of *Jones* v. *Industrial Commission,* supra, presents not only a precedent but a situation strikingly parallel to this case. In that case the commission found "that applicant's disability was not caused nor contributed to by an accident arising out of or in the course of his employment." [90 Utah 121, 61 P. 2d 11.] There was no question but that applicant had suffered an injury and expended much on hospitalization. But the finding of the commission could have been sustained on (a) the ground that, while the employee suffered an accident, it was not in the course of his employment or (b) that, if he suffered an accident in the course of his employment, it did not result in his disability.

The court acknowledged that the finding could be sustained on either subsidiary finding but stated "we are in a dilemma in attempting to determine which of the two probabilities was the basis for denying plaintiff an award." The opinion further states, after noting that written findings are not required, quoting from *American Smelting & Refining Company* v. *Industrial Commission,* 79 Utah 302, 10 P. 2d 918, 920:

"* * * The commission having made findings of fact, it must be assumed that it found on all the facts that it deemed necessary to its decision. Otherwise the facts found could serve no useful purpose.

When the commission undertakes to make findings, it should find upon all of the material issues, otherwise a reviewing court is powerless to determine whether the award should be affirmed or annulled."

It is submitted that the Jones case cannot be distinguished from the instant case. Perhaps in this case the Board was not required to make findings but having done so it must find on the material issues. Here, too, we are "in a dilemma in attempting to determine which of the two probabilities was the basis for denying plaintiff" its request for a cease and desist order, to wit: (a) Whether the activities of supervisory employees were not per se interference as meant by the Act or (b) if they were, whether the Board failed to find for the plaintiff because it neglected to apply the doctrine of respondeat superior.

There is one other ground on which the conclusions of the main opinion may be sustained and that is by holding that the evidence shows that conduct of the supervisory employees was *in law not interference* as meant by the Act. I am somewhat at loss to discover whether the opinion places its conclusion on this ground or on the ground that the evidence sustains the finding of the Board, proceeding on the assumption that the Board did find that the conduct of the supervisory employees was not in fact interference. The opinion is by no means clear-cut in that regard. At places it seems to hold that in law there was no interference. For instance, it states "acts of Mrs. Pendleton prior to the time that the organization of the inside union was contemplated do not constitute *as a matter of law* interference with the rights of the employees to choose their own bargaining agent or cannot be construed as aiding the organization of an inside union." (Italics added) And at other places expressions used are susceptible of this interpretation. But, at still other places, it seems to be examining the evidence not for the purpose of determining whether there was in law no interference but whether the evidence sustained the findings of the Board. It ends by stating, "The record supports the finding of the Board."

I think what has really taken place is that the opinion unwittingly, under the guise of determining whether the evidence supported a finding, determined that in law the actions of the supervisory employees were not interference. This confusion is very unfortunate because it may lead to the belief that this court has determined that in law such conduct does not constitute interference, whereas in all cases where a Board found against the employer on similar type of evidence, quantitatively and qualitatively as much or even less than in this case, the courts have sustained the finding.

Having, I hope, demonstrated that this is a case where the Board omitted to make a necessary finding in the absence of which the prevailing opinion must rest on the proposition that the evidence *in law* would *not support* a finding of interference by the supervisory employees, I shall state why I think that such proposition is not only entirely untenable, but shows a disposition to so interpret the Act as to thwart its purposes and make it largely useless. In order to do that I shall begin with a study of the Act itself and the purposes it was meant to subserve.

We should first thoroughly fix in our minds the purpose of Chap. 55, Laws of Utah, 1937 (known in common parlance as our Little Wagner Act, and designed to accomplish for labor relations in intrastate industry what the Wagner Act was intended to accomplish in industry subject to Congressional action.

Essentially, the right to organize and join a labor organization was not given to the employee by the Act. The right already existed. It was by Sec. 8 "guaranteed." This is clear when we read Section 9, subsection (1), as follows:

"It shall be an unfair labor practice for an employer—(1) to interfere with, restrain or coerce employees in the exercise of the rights *guaranteed* in section 8." (Italics added).

And what are these rights which are guaranteed by Section 8? A quotation of the full section is the best answer. It reads:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

The statute did no more than announce and attempt to safeguard what was already a right. Said Mr. Chief Justice Hughes in *National Labor Relations Board* v. *Jones & Laughlin Steel Corporation*, 301 U. S. 1, 57 S. Ct. 615, 622, 81 L. Ed. 893, 108 A. L. R. 1352:

"That is a fundamental right. Employees have as clear a right to organize and select their representatives for lawful purposes as the respondent has to organize its business and select its own officers and agents. Discrimination and coercion to prevent the free exercise of the right of employees to self-organization and representation is a proper subject for condemnation by competent legislative authority. Long ago we stated the reason for labor organization. We said that they were organized out of the necessities of the situation; that a single employee was helpless in dealing with an employer; that he was dependent ordinarily on his daily wage for the maintenance of himself and family; that, if the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and resist arbitrary and unfair treatment; that union was essential to give laborers opportunity to deal on an equality with their employer. *American Steel Foundries* v. *Tri-City Central Trades Council*, 257 U. S. 184, 209, 42 S. Ct. 72, 78, 66 L. Ed. 189, 27 A. L. R. 360. We reiterated these views when we had under consideration the Railway Labor Act of 1926, 44 Stat. 577. Fully recognizing the legality of collective action on the part of employees in order to safeguard their proper interests, we said that Congress was not required to ignore this right but could safeguard it. Congress could seek to make appropriate collective action of employees an instrument of peace rather than of strife. We said that such collective action would be a mockery if representation were made futile by interference with freedom of choice. Hence the prohibition by Congress of interference with the selection of representatives for the purpose of negotiation and conference between employers and employees, 'instead of being an invasion of the constitutional right of either, was based on the recognition of the rights of both.' *Texas & N. O. R. Co.* v. *Brotherhood of Railway & S. S. Clerks*, supra. [281 U. S. 548, 50 S. Ct. 427, 74 L. Ed. 1034.] We have reasserted the same principle in sustaining the application of the Railway Labor Act as amended in 1934 (45 U. S. C. A. §

151 et seq.). *Virginian Railway Co.* v. *System Federation, No.* 40, supra. [300 U. S. 515, 57 S. Ct. 592, 81 L. Ed. 789.] * * *

"Experience has abundantly demonstrated that the recognition of the right of employees to self-organization and to have representatives of their own choosing for the purpose of collective bargaining is often an essential condition of industrial peace. Refusal to confer and negotiate has been one of the most prolific causes of strife. This is such an outstanding fact in the history of labor disturbances that it is a proper subject of judicial notice and requires no citation of instances. The opinion in the case of *Virginian Railway Co.* v. *System Federation No. 40,* supra, points out that in the case of carriers, experience has shown that before the amendment, of 1934, of the Railway Labor Act, 'when there was no dispute as to the organizations authorized to represent the employees, and when there was willingness of the employer to meet such representative for a discussion of their grievances, amicable adjustment of differences had generally followed and strikes had been avoided.' That, on the other hand, 'a prolific source of dispute had been the maintenance by the railroads of company unions and the denial by railway management of the authority of representatives chosen by their employees.'"

The matter could hardly be stated better. It might remain to add that in safeguarding the right of self-organization the legislature looked into the future. To say that the worker shall have the right to organize and yet fail to safeguard such right is making the promise by the lip but breaking it to the hope. It has long been recognized that the struggle for collective bargaining has resulted in industrial warfare and that until there are unions strong enough to compel collective bargaining and to discipline their own members, there will be labor war. Strong unions ultimately bring a different type of leadership—a constructive rather than a battling leadership. As long as workers must "fight" to organize and "fight" to bargain collectively through their own representatives, just so long will they select leaders equipped to lead them in battle. For the psychology of war in industry we must substitute the psychology of constructive cooperation. Mr. Chief Justice Hughes might have added that it was also "an outstanding fact in the history of labor disturbances subject to proper judicial notice" that strong unions usually have constructive leadership and disci-

pline of members. England, Holland, and the Scandinavian countries furnish examples of what really may be accomplished by this sort of leadership. It follows, therefore, that any weakening by decision or otherwise of the *safeguarding* of this right to organize, encourages resistance and prolongs the transition period through which we must go to substitute for the battling union the self-disciplined and constructive union.

With the purpose thoroughly in mind that the Act was designed to "guarantee" or "safeguard" an already existing right, we must make our interpretations of the words used in the Act serve that purpose wherever possible to do so. The theory back of the Act was to give the worker the utmost liberty and freedom of choice whether or not to join a union, without interference, restraint, or coercion by the employer. It was as if the law had meant largely to insulate the employee and employer in this matter and to treat the employee as if he had no relation to the employer as far as self-organization was concerned.

In this case I am not concerned with the word "coerce" and not so much with the word "restrain" except as a subtle sort of restraining may or may not have been exercised through "interference" if any. I am concerned with the meaning of the word "interfere." Naturally if it means the same thing as "coercion" there was no need to use the latter. I think the prevailing opinion has rather tested out the issue with the measuring rod of "coercion" rather than with that of "interference." I do not think any coercion was applied to the lower employees either by the employer or by the higher employees as that word is used in Section 9.

The very nature of the employer's advantaged position requires him to be careful to do no act which will interfere with freedom of choice. He has the job to give and to take away. That gives him a tremendous power to influence his employees in a competitive labor market, because in most cases an employee's job is more than just a job—it is a living. It means the difference between want, hardship, and

perhaps misery on the one hand, and subsistence on the other. Under such circumstances the worker is likely to be timid and fearful. Any suggestion of desire of the employer that she or he refrain from joining any union or a certain union or institution, or that she or he join a company union, naturally might interfere with the freedom of choice of that employee.

The Board, as said before, made no finding as to whether the acts of the supervisory employees were "interference" but only that the *employer* as a matter of fact did not interfere. Whether this finding was because the acts of the supervisory employees were not interference or because the Board failed to apply the principle of respondeat superior does not appear.

It appears without dispute in this case that an outside labor union was attempting to organize the employees of the hotel when the activities of the supervisory employees took place. What were these activities? Mrs. Pendleton, housekeeper for 21 years and a sister to Mrs. Waters, President of the defendant company, with supervisory powers and power to hire and fire the maids, after calling the girls together through Miss Kolstead, the assistant housekeeper, said that she deplored "all these terrible things—these union activities." She wanted the girls to continue and go on in a "nice peaceable manner that we have been going on all these years." She directed attention to the "millions of dollars that were going to the heads of the unions every day." She said, "Let's all get together and be just like one big family." She stated that she would try to get a raise for them and did obtain the same next day, although they were required to put in longer hours for it. Later, this same lady, together with Miss Kolstead and Mrs. Jensen (in charge of the linen room under Mrs. Pendleton) rounded up the maids and, if they did not instruct the maids to attend, at least solicited their attendance at the meeting to form a House Union. This meeting was held on company property. It was presided over by J. F. Ballif—auditor. Mr. Shepherd, the superin-

tendent of service, in charge of bell boys and elevator girls, with power to hire and fire, and Mr. Eliason, chief clerk, occupied seats on the rostrum. Mrs. Jensen and Miss Kolstead, were present at the meeting. Mr. Shepherd was the moving spirit in initiating the House Union. And there were others facts of this nature disclosed by the record.

Certainly it cannot be said that the Board could not have found as a matter of fact that this constituted interference and did interfere with the employee's freedom of choice. If I relate myself to the realities of life, it appears plain that the employee, fearful of his job, and needing it, might not under these circumstances take a chance at joining the outside union unless he was quite stout-hearted. Defendant states that the evidence shows that the maids were not influenced and contends that the test of interference is whether persons were actually influenced. I think interference means acts calculated and likely to influence and take away free choice. Perhaps some stout-hearted employee might not be influenced in his choice, even by threats of discharge. But we must face realities. Most employees are fearful to go against not only the desires of their employers but what they may easily conceive to be such desires as reflected in the action of the upper or confidential employees. And, as a reality, very few persons after a fait accompli would care to admit on the stand that they were influenced even if they realized it. No one desires to admit in public what might be taken to be a weak will. Furthermore, the same influences that rob the mind of a free choice in the selection of a union, are present generally to suggest to the mind that there was no lack of free choice. A person who would not join an outside union because fearful of the consequences might easily convince himself because of the same influence operating at the time of the hearing, that his choice had not been interfered with.

It is admitted that these activities of organizing the company union were for the purpose of forestalling the further progress of the outside union. The Board might find that

when the sum total of these activities with their natural, likely, and intended effect are taken into consideration, they constituted what the Act meant to prevent, if carried on by the employer or management.

In Lien on Labor Law and Relations, Chapter 6, Sections 58 and 67, are discussed a number of types of interfering acts, taken from the decisions of the National Labor Relations Board, which decisions were taken to the courts and were upheld by the latter. These types furnish guides for the determination of what constitutes interference. See also, Labor and the Government (Twentieth Century Fund), Chapter 4, pp. 84, 85, for a list of factors taken into consideration by Boards; also, "What is Employer Domination or Support"—Van Dusen, 13 Temple University Law Quarterly 83-88; also Fairley, The Company Union in Plan and Practice, pp. 44, 45. Space forbids my setting out the criteria of interfering acts set out in these works, but it may be confidently asserted that applied to the facts in this case as an aid, the Board might well have arrived at the conclusion that the conduct of the supervisory employees constituted interference as meant by the Act.

Therefore, I must conclude: (1) That the Board failed to make findings on a very material issue; (2) that the prevailing opinion has unwittingly presumed that the Board did make such implied findings and has sought to uphold it; (3) that the conclusion of the court can only be sustained on the theory that in law the evidence does not show interference; (4) that the evidence cannot be so construed; (5) that hence the matter should be sent back for further findings as indicated in this opinion; and (6) that the prevailing opinion in this case goes a long way to thwart the purposes of the Act and nullify the law.