## UTAH POULTRY PRODUCERS COOPERATIVE ASS'N. v. UTAH LABOR RELATIONS BOARD et al.

No. 6659. Decided June 16, 1944. (149 P. 2d 643.)

See 39 C. J. Master and Servant, sec. 27; Review of findings of National Labor Relations Board, note, 125 A. L. R. 646. See, also, 31 Am. Jur. 901.

*Harry Pugsley* and *Elias Hansen,* both of Salt Lake City, for plaintiff.

*Grover A. Giles,* Atty. Gen., *Herbert F. Smart,* Asst. Atty. Gen., and *Clarence M. Beck,* of Salt Lake City, for defendants.

McDONOUGH, Justice.

By writ of review, petitioner seeks to vacate and set aside the order of the Utah Labor Relations Board dated September 8, 1943. A petition of the Labor Board for an order of enforcement is also before us. The Board found that petitioner Utah Poultry Producers Cooperative Association, hereinafter referred to as the Association, was guilty of an unfair labor practice by discharging from its employment the complainant Willis L. Jacobson. It concluded that his dismissal was due to his activity in behalf of the Independent Union of Poultry Employees; that the Association was guilty of interfering with and restraining employees in the exercise of their rights, and of dominating and interfering with the administration of said Independent Union. The order sought by petitioner to be annulled and by the Board to be enforced, required reinstatement of Jacobson as an employee, and ordered back pay for loss sustained by reason of unemployment from the date of his discharge. It also required petitioner Association and the Independent Union to show cause why the Independent Union of Poultry Employees should not be disorganized or reorganized by reason of alleged domination by the management of the Association.

Petitioner attacks the failure of the Board to make findings which fairly reflect the evidence and alleges that the findings fail to support the charge of domination of the Independent Union by the Association's management. It likewise contends that there is no substantial evidence to support any of the following specific findings or conclusions: (1) That the Association dominated or controlled the activities of the Independent Union since January 1943, or at any other time, or that it interfered with the activities

of such union. (2) That petitioner's management discharged Jacobson, the complainant, "for union activity in which he sought to enlist the services of the National Labor Relations Board for investigation of respondent's labor practices and other conduct incident to functioning of the Independent Union of Poultry Employees."

Sometime in 1938, A. F. of L. Local No. 311, Union of Amalgamated Meat Cutters and Butcher Workmen of North America (consisting among others of poultry workers, egg candlers, feed millmen), notified the Association that it had obtained a majority of the employees at the 1800 South West Temple Street plant in Salt Lake City and that it claimed to be the sole bargaining agent for said workers. The Association granted recognition upon such demand, and negotiations were initiated between the Association's management and the officers of said A. F. of L. local. A Closed shop agreement resulted. Some disagreements arose within the union during the latter part of that year, in part over collection of certain dues which some members claimed to be excessive and not used for the benefit of the members. This group then voted a Christmas present of $7.50 to each member out of the local treasury. When the international officers were informed of this novel manifestation of Christmastide giving, they declared Local 311 in a state of mutiny and tied up the funds at the bank. The plant employees then called a meeting some time in January 1939, at which all except 13 voted to secede from the A. F. of L. union and to form the Independent Union of Poultry Employees. They employed an attorney to aid them in effecting an organization. The Association management refused to recognize this union until there was an election in accordance with National Labor Board regulations. The election was held and the Independent Union was certified as the bargaining agent. This union then negotiated with the Association for a new contract. The complainant, Jacobson, as first president of this new union, was very active in these negotiations.

During 1942 and 1943, Jacobson and one Quist had urged the union to request the National Labor Relations Board to investigate the labor practices of the Association. Favorable action on the matter was taken by the council in 1942, but the matter was not submitted to the membership for approval. When the subject was again called up by Jacobson in January 1943, some disagreement occurred between him and Breeze, president of the union, as to the advisability of making such a request. At that time, their application for a wage increase which had been approved by the management, was still pending before the War Labor Board. Apparently some of the union membership was opposed to any proceeding which might create some difficulty on the wage question. Jacobson, Breeze and another council member then consulted the union's legal counsel, who stated that from the facts related and the remoteness of events, he seriously doubted if there was any real case which could be considered by the National Labor Relations Board. The remoteness of events evidently referred to activities some four years prior in connection with the organization of the Independent Union.

At the next general meeting of the union when the proposition of requesting investigation by the N. L. R. B. was put to a vote, only Jacobson and Quist voted in favor of the resolution, and the balance of the membership present voted in the negative. Jacobson continued to discuss the matter personally with other employees.

Some time in 1943, there appeared in a local publication called the "Searchlight" an article purporting to give the history of the formation of the Independent Union. The purport of the article was that the union was formed at the behest and under the guidance of Mr. Clyde Edmonds, manager of the Association; and that it was company dominated. It contained a cartoon of Edmonds. Mr. Jacobson, it appears, furnished to the paper the information upon which the article was based. A copy of this issue of the "Searchlight" was by someone pasted on the bulletin board at the plant. Another was mailed to Edmonds by a friend.

A package containing a framed copy of the cartoon was placed on Edmond's desk, and inscribed thereon was "compliments of Jake and Bill." Edmonds assumed that "Jake and Bill" meant Jacobson and Quist.

At about the same time, Jacobson wrote and he and Quist signed a letter to one Butler, who someone told them was an investigator for the N. L. R. B., stating that if the Board undertook an investigation of labor relations at the plant they would give their cooperation. This letter in some manner found its way to the desk of Edmonds.

After receipt of the copy of the "Searchlight", Edmonds called a meeting of the employees. He read the article to them; stated that the ones who were responsible for furnishing the writer with the material therefor were present at the meeting. He then read a provision of the contract between the Union and the Association which provided that if a member of the union were disloyal to the management, he should be expelled from the union. Explusion from the union would terminate employment by the Association.

A witness testified that in 1938 when the A. F. of L. was organizing another plant of the Association, Edmonds asked the witness, one Jancke, a supervising employee and not a member of the Union and who was then president of the plant's credit union, to see if he could not prevail upon the men to keep the bargaining agency as it was. He stated he did speak at a meeting to that effect—evidently without favorable results. Other witnesses testified that on another occasion Edmonds told a meeting of the Independent that he hoped they were good enough salesmen to get the employees of the other plant to join their union.

Was the Board's finding that the Independent Union was dominated and controlled by the Association a permissible one? We think not. In the first place, the union in question is not a party to these proceedings, though the finding is made the basis of an order to show cause as to why it should not be disorganized or reorganized. Secondly, there is no direct evidence in the record that the Association in any way attempted to influence the action

or voice of any of the members as to union policies or leadership. Indeed, Jacobson testified to his independence as an officer of the organization and testified that there was no attempt by Association officers to coerce him or to interfere in union affairs during his encumbancy as president. Neither he nor any other witness testified to any such interference. Jacobson likewise testified that the purported information which he furnished the editor of the "Searchlight" was told to him—apparently several years before— by one Barnes. Barnes was president of the A. F. of L. local at the time of the Christmas dividend incident. He testified at the hearing and his evidence reveals that he was one of the originators of the dividend idea and was active in the withdrawal from the A. F. of L. and the formation of the Independent Union. He, without consulting any of the union membership, discussed the matter of the Christmas dividend with Edmonds. He stated the idea was his own and was not suggested by Edmonds. His testimony reveals that no pressure was brought to bear as any advice given by the management relative to the formation of the Independent Union. It appears that the Board inferred domination of the union by the Association because of the quality of the leadership of the former.

In the report of the trial examiner, which report was adopted by the Labor Board, there is contained, in addition to findings of fact and conclusions, what is entitled "discussion." Among the observations made in that portion of the report, is the following:

"The failure of the present president of the Independent Union and the majority of the officers of the council to accord Jacobson a full investigation and hearing in his dismissal and complaint against the company for having been fired on questionable grounds impresses the writer forcibly with this unusual union situation: that the president and the majority of the council are interested chiefly in polishing the halo over the head of the respondent and in defeating efforts of union membership, even though they be members of the union council, from legitimate union business. It is my opinion that the union council with one or two exceptions, is subservient and tractable to the respondent, supersensitive and responsive to its policy and feelings, almost to the exclusion of fundamental union interests. My recommendation

to the Board is that the Independent Union be given an opportunity within the next sixty days in open hearing to show cause why the Independent Union of Poultry Employees should not be reorganized or disestablished.

"Up until January 1, 1943—a period of four years—the Independent Union had virile, independent leadership, as contrasted to the sterile, ineffective condition that now prevails.

"At this juncture we point out that an independent union, when vigorous and reflective of employees' sentiments, has legal right to existence and to act for employees as fundamentally as unions affiliated with other bodies of state or national scope. However, the independent must, in fact, be independent of employer influence and control."

The trial examiner apparently concluded that the sterile, ineffective leadership which existed during the few months prior to the hearing was the result of company domination. He evidently did not conclude that the virile, independent leadership which had existed theretofore was the result thereof; and yet it is to be observed that the labor conditions existing at the plant concerning which intervention of the National Labor Relations Board was invited by Jacobson and Quist were conditions which existed at least as early as 1942; and the alleged intermeddling of Edwards in the matter of organizing a bargaining agent which was made the subject of the "Searchlight" article occurred—if at all—at the very inception of the organization in 1939.

It may be well to remember at this point that the function of the Labor Relations Board is not to provide leadership for a union, either virile or supine. It is the membership of the union which has the right to provide its leadership and unless there is evidence of company interference in such selection, the action of the union membership in making choice of their officers and in directing their activity is no concern of the Board. The right of self organization is guaranteed by the law. That right is defeated if interfered with by the Board as truly as by the intermeddling of the employer. It is certainly unwarranted here to infer from the mere fact of a lack of aggressive leadership that such condition resulted from company domination.

The finding of such domination and interference finds no substantial support in the record.

How stands the record as to the finding relative to the cause of Jacobson's discharge?

The reason given by Jacobson's foreman, and testified to by Edmonds for the discharge of Jacobson, detailed incidents which they contend showed an uncooperative attitude on his part as a workman. The incident which immediately preceded his discharge was his refusal to fill out a questionnaire relative to his draft status and details of employment. The reason given by the management for requesting employees to answer the questions contained therein was that the Association might have comprehensive data in order to determine whether to ask for service deferment for certain employees when called for service. Such survey was suggested by the office of the state director of selective service. Jacobson refused several requests by his foreman to write in the information asked for. All other male employees were requested to and did fill out such questionnaire.

Shortly prior to this occurrence the Association had posted a ruling that members of the Association would not be permitted to purchase poultry feed for non-members. Jacobson was, as were many of the employees, a member of the Association. As such member he sold poultry produce and purchased feed from the Association at member prices. Prior to the issuance of the recited ruling, the purchase of feed for a non-member was apparently not frowned upon. However, a shortage of feed at the time of the order, suggested its promulgation. After he was advised of the rule, Jacobson purchased, in contravention thereof, a small quantity of feed for an elderly couple who were his neighbors.

The foregoing two instances of unwillingness to cooperate and another occurring some eleven months prior thereto when Jacobson refused to comply with a proper direction of his foreman, plus his action in posting the "Searchlight" article on the bulletin board and of giving the purported

information contained therein were cited by his foreman as the reasons for his discharge. As to the "Searchlight" incident, in light of the lack of any authentic information on the part of Jacobson as to the facts and the absence of any investigation by him relative thereto, there is no reason why the manager should not take that conduct into consideration in determining whether Jacobson should be retained as an employee—unless there could be inferred therefrom an attempt upon the part of the management to discourage proper aggressive expression and effort upon an employee's part in furtherance of true collective bargaining.

It should be here noted that some time after Edmonds had spoken to the union members about the published article, the union council did vote to expel Jacobson but their action in doing so was not sustained by the membership and he was retained as a member. From this action it appears that however responsive to the wishes of management the council may have been, the union membership evidenced a lack of domination of such union by management. Since the selection of leadership is in the members themselves, the remedy for any defect therein lies solely with them.

In view of all of the foregoing was the finding that Jacobson was discharged because of union activity supported by substantial evidence? If so the finding must be upheld. *American Foundry & Machine Co.* v. *Utah Labor Relations Board*, Utah, 141 P. 2d 390; *Building Service Employees* v. *Newhouse Realty Co. et al.*, 97 Utah 562, 95 P. 2d 507.

The activity of Jacobson in endeavoring to secure N. L. R. B. intervention is specifically mentioned in the Board's finding as union activity motivating his discharge. Were there substantial evidence to support the board's finding of union domination by the management of the Association, its finding as to the cause of Jacobson's discharge, might find support in the record. But in the light of his aggressive pro-union activity over a period of four years, which was well known to the management, since much of such activity consisted in negotiation with

the management in behalf of the workers at the plant; and in view of the not insubstantial reasons, when reviewed cumulatively, advanced for his discharge; we are of the opinion that the finding of the Board is without the support of substantial evidence. This is not, on the record, a case where the real reason for dismissal was union activity protected by the provisions of our statutes, and the cause assigned therefor mere subterfuge.

The order of the Board is set aside and the application of the Board for enforcement thereof is denied.

WOLFE, C. J. and LARSON and WADE, JJ., concur.

MOFFAT, J., deceased.