TEXAS & NEW ORLEANS RAILROAD COMPANY ET AL. *v.* BROTHERHOOD OF RAILWAY & STEAMSHIP CLERKS ET AL.

No. 469. Argued May 1, 2, 1930.—Decided May 26, 1930.

550

See 24 F. (2d) 426; 25 *id.* 873, 876.

*Mr. J. H. Tallichet,* with whom *Messrs. C. R. Wharton, John P. Bullington, Calvin B. Garwood, H. M. Garwood,* and *Walker B. Spencer* were on the brief, for petitioners.

Messrs. *Donald R. Richberg* and *John H. Crooker,* with whom *Mr. Carl G. Stearns* was on the brief, for respondents.

554

Mr. Chief Justice Hughes delivered the opinion of the Court.

This suit was brought in the District Court by the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, Southern Pacific Lines in Texas and Louisiana, a voluntary association, and H. W. Harper, General Chairman of its System Board of Adjustment, against the Texas and New Orleans Railroad Company, and certain officers and agents of that Company, to obtain an injunction restraining the defend-

ants from interfering with, influencing or coercing the clerical employees of the Railroad Company in the matter of their organization and designation of representatives . for the purposes set forth in the Railway Labor Act of May 20, 1926, c. 347, 44 Stat. 577; U. S. C., Tit. 45, secs. 151–163.

The substance of the allegations of the bill of complaint was that the Brotherhood, since its organization in September, 1918, had been authorized by a majority of the railway clerks in the employ of the Railroad Company (apart from general office employees) to represent them in all matters relating to their employment; that this representation was recognized by the Railroad Company before and after the application by the Brotherhood in November, 1925, for an increase of the wages of the railway clerks and after the denial of that application by the Railroad Company and the reference of the controversy by the Brotherhood to the United States Board of Mediation; that, while the controversy was pending before that Board, the Railroad Company instigated the formation of a union of its railway clerks (other than general office employees) known as the "Association of Clerical Employees—Southern Pacific Lines"; and that the Railroad Company had endeavored to intimidate members of the Brotherhood and to coerce them to withdraw from it and to make the Association their representative in dealings with the Railroad Company, and thus to prevent the railway clerks from freely designating their representatives by collective action.

The District Court granted a temporary injunction.[1] Thereafter the Railroad Company recognized the Asso-

---

[1] The injunction order provided as follows:

" That the defendant Texas and New Orleans Railroad Company (a corporation and common carrier owning, leasing, and operating certain railroads throughout the States of Texas and Louisiana), its officers, servants, and agents are hereby enjoined and restrained from in any way or manner interfering with, influencing, intimidating, or

ciation of Clerical Employees—Southern Pacific Lines as the representative of the clerical employees of the Company. The Railroad Company stated that this course was taken after a committee of the Association had shown authorizations signed by those who were regarded as constituting a majority of the employees of the described class. The subsequent action of the Railroad Company and its officers and agents was in accord with this recognition of the Association and the consequent non-recogni-

coercing plaintiffs or any of the approximately seventeen hundred clerical employees (and being the clerical employees described and referred to in plaintiffs' petition, which includes approximately seventeen hundred railroad clerks in the employ of the defendant Railroad Company on its lines throughout the States of Texas and Louisiana, except such clerical employees as are employed and engaged in its general office in the City of Houston, Texas, and in its general office in the City of New Orleans, Louisiana), with respect to their free and untrammeled right of selecting or designating their representatives for the purpose of considering and deciding any and all disputes between said clerical employees and the defendant Railroad Company; and further enjoining and restraining said defendant Railroad Company, its officers, servants, and agents from in any way or manner interfering with, influencing, intimidating, or coercing plaintiffs or any of said clerical employees herein referred to of their free and untrammeled right of self-organization.

" Nothing in this injunction shall be considered or construed as authority to prevent any employee of said defendant Railroad Company, in the class referred to, from organizing, joining, promoting, or fostering as many unions as he or .they (meaning such employees in the class referred to) may desire, and in any way which he or they may desire, and with the assistance and aid of any of his fellow employees in any way and to any extent that said fellow employees (in the class referred to) may desire; nor shall anything in this injunction be considered or construed as authority or permission for any officer or agent of said company, or any employee, acting for or on behalf of the defendant Roalroad Company, attempting to influence or to interfere with said selection or designation of their said representatives, or their right to self-organization as herein referred to, upon any pretext that they are acting individually and not as representatives of said defendant corporation."

tion of the Brotherhood. In proceedings to punish for contempt, the District Court decided that the Railroad Company and certain of its officers who were defendants had violated the order of injunction and completely nullified it. The Court directed that, in order to purge themselves of this contempt, the Railroad Company and these officers should completely "disestablish the Association of Clerical Employees," as it was then constituted as the recognized representative of the clerical employees of the Railroad Company, and should reinstate the Brotherhood as such representative, until such time as these employees by a secret ballot taken in accordance with the further direction of the Court, and without the dictation or interference of the Railroad Company and its officers, should choose other representatives. The order also required the restoration to service and to stated privileges of certain employees who had been discharged by the Railroad Company. 24 F. (2d) 426. Punishment was prescribed in case the defendants did not purge themselves of contempt as directed.

On final hearing, the temporary injunction was made permanent. 25 F. (2d) 873. At the same time, a motion to vacate the order in the contempt proceedings was denied. 25 F. (2d) 876. The Circuit Court of Appeals affirmed the decree, holding that the injunction was properly granted and that, in imposing conditions for the purging of the defendants of contempt, the District Court had not gone beyond the appropriate exercise of its authority in providing for the restoration of the *status quo*. 33 F. (2d) 13. This Court granted a writ of certiorari. 280 U. S. 550.

The bill of complaint invoked subdivision third of section 2 of the Railway Labor Act of 1926 (c. 347, 44 Stat. 577), which provides as follows:

" Third. Representatives, for the purposes of this Act, shall be designated by the respective parties in such man-

ner as may be provided in their corporate organization or unincorporated association, or by other means of collective action, without interference, influence, or coercion exercised by either party over the self-organization or designation of representatives by the other."

The controversy is with respect to the construction, validity and application of this statutory provision. The petitioners, the Railroad Company and its officers, contend that the provision confers merely an abstract right which was not intended to be enforced by legal proceedings; that, in so far as the statute undertakes to prevent either party from influencing the other in the selection of representatives, it is unconstitutional because it seeks to take away an inherent and inalienable right in violation of the First and Fifth Amendments of the Federal Constitution; that the granting of the injunction was prohibited by Section 20 of the Clayton Act (U. S. C., Tit. 29, sec. 52); that in any event the action taken by the Railroad Company and its officers in the recognition of the Association of Clerical Employees, and in other proceedings following upon that recognition, was not contrary to law and that there was no warrant for the interposition of the court either in granting the injunction order or in the proceedings for punishment for the alleged contempt.

On the questions of fact, both courts below decided against the petitioners. Under the well-established rule, this Court accepts the findings in which two courts concur, unless clear error is shown. *Stuart* v. *Hayden,* 169 U. S. 1, 14; *Texas & Pacific Railway Company* v. *Railroad Commission,* 232 U. S. 338; *Washington Securities Company* v. *United States,* 234 U. S. 76, 78; *Bodkin* v. *Edwards,* 255 U. S. 221, 223. We cannot say that there was such error in this case. Both the District Court and the Circuit Court of Appeals approached the consideration of the evidence as to intimidation and coercion, and re-

solved such conflicts as the evidence presented, in the light of the demonstration that a strong motive existed on the part of the Railroad Company to oppose the demands of the Brotherhood and to promote another organization of the clerical employees which would be more favorable to the interests and contentions of the Company. Both courts found the explanation of the Company's attitude in the letter addressed by H. M. Lull, executive vice-president of the Railroad Company, to A. D. McDonald, its president, under date of May 24, 1927, shortly before the activities of which complaint was made in this suit. In this letter Mr. Lull referred to the pendency before the United States Board of Mediation of the demand of the Brotherhood for an increase of wages for the clerical employees, and it was stated that if the matter went to arbitration, and the award was made on the same basis as one which had recently been made with respect to the lines west of El Paso, it would mean an increased pay-roll cost of approximately $340,000 per annum. Mr. Lull said that from the best information obtainable the majority of the clerical and station service employees of the Railroad Company did not belong to the national organization (the Brotherhood), and that " it is our intention, when handling the matter in mediation proceedings, to raise the question of the right of this organization to represent these employees and if arbitration is proposed we shall decline to arbitrate on the basis that the petitioner does not represent the majority of the employees. This will permit us to get away from the interference of this organization, and if successful in this, I am satisfied we can make settlement with our own employees at a cost not to exceed $75,000 per annum."

Motive is a persuasive interpreter of equivocal conduct, and the petitioners are not entitled to complain because their activities were viewed in the light of manifest interest and purpose. The most that can be said in favor

of the petitioners on the questions of fact is that the evidence permits conflicting inferences, and this is not enough. The circumstances of the soliciting of authorizations and memberships on behalf of the Association, the fact that employees of the Railroad Company who were active in promoting the development of the Association were permitted to devote their time to that enterprise without deduction from their pay, the charge to the Railroad Company of expenses incurred in recruiting members of the Association, the reports made to the Railroad Company of the progress of these efforts, and the discharge from the service of the Railroad Company of leading representatives of the Brotherhood and the cancellation of their passes, gave support, despite the attempted justification of these proceedings, to the conclusion of the courts below that the Railroad Company and its officers were actually engaged in promoting the organization of the Association in the interest of the Company and in opposition to the Brotherhood, and that these activities constituted an actual interference with the liberty of the clerical employees in the selection of their representatives. In this view, we decline to subject to minute scrutiny the language employed by these courts in discussing questions of fact (*Page* v. *Rogers*, 211 U. S. 575, 577) and we pass to the important questions of law whether the statute imposed a legal duty upon the Railroad Company, that is, an obligation enforceable by judicial proceedings.

It is unnecessary to review the history of the legislation enacted by Congress in relation to the settlement of railway labor disputes, as earlier efforts culminated in Title III of the Transportation Act, 1920 (c. 91, 41 Stat. 456, 469) the purpose and effect of which have been determined by this Court. In *Pennsylvania Railroad Company* v. *United States Railroad Labor Board*, 261 U. S. 72, the question was whether the members of the Railroad

Labor Board as constituted under the provisions of the Transportation Act, 1920, had exceeded their powers. The Court held that the Board had jurisdiction to hear and decide a dispute over rules and working conditions upon the application of either side, when the parties had failed to agree and an adjustment board had not been organized. The Board also had jurisdiction to decide who might represent the employees in the conferences contemplated by the statute and to make reasonable rules for ascertaining the will of the employees in this respect. Interference by injunction with the exercise of the discretion of the Board in the matters committed to it, and with the publication of its opinions, was decided to be unwarranted. The Court thought it evident that Congress considered it to be "of the highest public interest to prevent the interruption of interstate commerce by labor disputes and strikes," and that its plan was " to encourage settlement without strikes, first by conference between the parties; failing that, by reference to adjustment boards of the parties' own choosing," and, if this proved to be ineffective, " by a full hearing before a National Board" organized as the statute provided. But the Court added: " The decisions of the Labor Board are not to be enforced by process. The only sanction of its decision is to be the force of public opinion invoked by the fairness of a full hearing, the intrinsic justice of the conclusion, strengthened by the official prestige of the Board, and the full publication of the violation of such decision by any party to the proceeding." It was said to be the evident thought of Congress " that the economic interest of every member of the Public in the undisturbed flow of interstate commerce and the acute inconvenience to which all must be subjected by an interruption caused by a serious and widespread labor dispute, fastens public attention closely on all the circumstances of the controversy and arouses public criticism of the side thought to be at

fault." *Id.* pp. 79, 80. The Court concluded that the Labor Board was "to act as a Board of Arbitration," but that there was "no constraint" upon the parties "to do what the Board decides they should do except the moral constraint of publication of its decision." *Id.* p. 84.

The provisions of Title III of the Transportation Act, 1920, were again before the Court in *Pennsylvania Railroad System and Allied Lines Federation No. 90* v. *Pennsylvania Railroad Company*, 267 U. S. 203. This was a suit by a union to enjoin the Railroad Company from carrying out an alleged conspiracy to defeat the provisions of the legislation establishing the Railroad Labor Board. The complainants, the Court said, sought " to enforce by mandatory injunction a compliance with a decision of the Board "; and the Court held that " such a remedy by injunction in a court, it was not the intention of Congress to provide." *Id.* p. 216. The Court pointed out that " the ultimate decision of the Board, it is conceded, is not compulsory, and no process is furnished to enforce it." It was in the light of these conclusions as to the purport of the statute that the Court considered the freedom of action of the Railroad Company. The Court said that the Company was using " every endeavor to avoid compliance with the judgment and principles of the Labor Board as to the proper method of securing representatives of the whole body of its employees," that it was " seeking to control its employees by agreements free from the influence of an independent trade union," and, so far as concerned its dealing with its employees, was " refusing to comply with the decisions of the Labor Board." But the Court held that this conduct was within the strict legal rights of the Railroad Company and that Congress had not intended to make such conduct legally actionable. *Id.* p. 217.

It was with clear appreciation of the infirmity of the existing legislation, and in the endeavor to establish a

more practicable plan in order to accomplish the desired result, that Congress enacted the Railway Labor Act of 1926. It was decided to make a fresh start. The situation was thus described in the report of the bill to the Senate by the Committee on Interstate Commerce (69th Cong., 1st sess., Sen. Rep. No. 222): " In view of the fact that the employees absolutely refuse to appear before the labor board and that many of the important railroads are themselves opposed to it, that it has been held by the Supreme Court to have no power to enforce its judgments, that its authority is not recognized or respected by the employees and by a number of important railroads, that the President has suggested that it would be wise to seek a substitute for it, and that the party platforms of both the Republican and Democratic Parties in 1924 clearly indicated dissatisfaction with the provisions of the transportation act relating to labor, the committee concluded that the time had arrived when the labor board should be abolished and the provisions relating to labor in the transportation act, 1920, should be repealed."

The bill was introduced as the result of prolonged conferences between representative committees of railroad presidents and of executives of railroad labor organizations, and embodied an agreement of a large majority of both.[2] The provisions of Title III of the Transportation Act, 1920, and also the Act of July 15, 1913 (c. 6, 38 Stat.

---

[2] In the report of the bill by the Committee on Interstate and Foreign Commerce to the House of Representatives, it was said (69th Cong. 1st sess., H. R. Rep. No. 328):

" The bill was introduced as the product of negotiations and conferences between a representative committee of railroad presidents and a representative committee of railroad labor organization executives, extending over several months, which were concluded with the approval of the bill, respectively, by the Association of Railway Executives and by the executives of 20 railroad labor organizations. As introduced, it represented the agreement of railway managements operating over 80 per cent of the railroad mileage

103) which provided for mediation, conciliation and arbitration in controversies with railway employees, were repealed.

While adhering in the new statute to the policy of providing for the amicable adjustment of labor disputes, and for voluntary submissions to arbitration as opposed to a system of compulsory arbitration, Congress buttressed this policy by creating certain definite legal obligations. The outstanding feature of the Act of 1926 is the provision for an enforceable award in arbitration proceedings. The arbitration is voluntary, but the award pursuant to the arbitration is conclusive upon the parties as to the merits and facts of the controversy submitted. (Section 9.) The award is to be filed in the clerk's office of the District Court of the United States designated in the agreement to arbitrate, and unless a petition to impeach the award is filed within ten days, the court is to enter judgment on the award, and this judgment is final and conclusive. Petition for the impeachment of the award may be made upon the grounds that the award does not conform to the substantive requirements of the Act or to the stipulation of the parties, or that the proceedings were not in accordance with the Act or were tainted with fraud or corruption. But the court is not to entertain such a petition on the ground that the award is invalid for uncer-

and labor organizations representing an overwhelming majority of the railroad employees."

The committee of the Senate on Interstate Commerce reported to the Senate on this point, as follows (69th Cong., 1st sess., Sen. Rep. No. 222):

" The railroads favoring the bill appeared before the committee through their representatives and advocated it. None of the railroads opposing the bill appeared either in person or by any representative. The bill was agreed to also by all the organizations known as ' standard recognized railway labor organizations,' 20 in number, and these appeared by their representatives before the committee in advocacy of the bill."

tainty, and in such case the remedy is to be found in a submission of the award to a reconvened board or to a sub-committee thereof for interpretation, as provided in the Act. Thus it is contemplated that the proceedings for the amicable adjustment of disputes will have an appropriate termination in a binding adjudication, enforceable as such.

Another definite object of the Act of 1926 is to provide, in case of a dispute between a carrier and its employees which has not been adjusted under the provisions of the Act, for the more effectual protection of interstate commerce from interruption to such a degree as to deprive any section of the country of essential transportation service. (Section 10.) In case the Board of Mediation established by the Act, as an independent agency in the executive branch of the Government, finds that such an interruption of interstate commerce is threatened, that Board is to notify the President, who may thereupon in his discretion create an emergency board of investigation to report, within thirty days, with respect to the dispute. The Act then provides that " After the creation of such board and for thirty days after such board has made its report to the President, no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose." (*Id.*) This prohibition, in order to safeguard the vital interests of the country while an investigation is in progress, manifestly imports a legal obligation. The Brotherhood insists, and we think rightly, that the major purpose of Congress in passing the Railway Labor Act was " to provide a machinery to prevent strikes." Section 10 is described by counsel for the Brotherhood as " a provision limiting the right to strike," and in this view it is insisted that there " is no possible question that Congress intended to make the provisions of Section 10 enforceable to the extent of authorizing any court of competent jurisdiction to restrain

either party to the controversy from changing the existing status during the sixty-day period provided for the emergency board." [3]

The provision of Section 10 is to be read in connection with the qualification in subdivision eighth of Section 9 that nothing in the Act shall be construed to require an individual employee to render labor without his consent or as making the quitting of service by an individual employee an illegal act, and that no court shall issue any process to compel the performance by an individual employee of labor without his consent. The purpose of this

---

[3] In the report to the House of Representatives by its Committee on Interstate and Foreign Commerce, it was stated as to this provision (69th Cong., 1st sess., H. R. Rep. No. 328):

. "This temporary emergency board will be able to express and to mobilize public opinion to an extent impossible to any permanent board or any agency of Government which has been heretofore created for that purpose. It is also highly important to point out that during the period of investigation and for 30 days thereafter the parties to the controversy are bound under the proposed law to maintain unchanged the conditions out of which the dispute arose, thereby assuring the parties and the public that the emergency board will have the full and unembarrassed opportunity to exert its authority and fulfil its important function."

The Committee on Interstate Commerce of the Senate stated in its report, with respect to a proposed amendment of section 10 forbidding strikes *eo nomine*, as follows (69th Cong., 1st sess., Sen. Rep. No. 222):

" The objection that the bill should in express terms forbid strikes during the period of the inquiry by the emergency board and for 30 days thereafter is successfully met, in the opinion of the committee, by the contention that in forbidding a change in the conditions out of which a dispute arose, one of which and a very fundamental one is the relationship of the parties, it already forbids any interruption of commerce during the period referred to; and if strikes were in express terms forbidden for a given period there might be an implication that after that period strikes to interfere with the passage of the United States mails and with continuous transportation service might be made legal. In the opinion of the committee, this possible implication should be avoided."

limitation was manifestly to protect the individual liberty of employees and not to affect proceedings in case of combinations or group action. The denial of legal process in the one case is significant with respect to its expected, appropriate use in the other.[4]

It is thus apparent that Congress, in the legislation of 1926, while elaborating a plan for amicable adjustments and voluntary arbitration of disputes between common carriers and their employees, thought it necessary to impose, and did impose, certain definite obligations enforceable by judicial proceedings. The question before us is whether a legal obligation of this sort is also to be found in the provisions of subdivision third of Section 2 of the Act providing that "Representatives for the purposes of this Act, shall be designated by the respective parties . . . without interference, influence, or coercion exercised by either party over the self-organization or designation of representatives by the other."

It is at once to be observed that Congress was not content with the general declaration of the duty of carriers and employees to make every reasonable effort to enter into and maintain agreements concerning rates of pay,

---

[4] In relation to this paragraph, the Senate Committee stated in its report (69th Cong., 1st sess., Sen. Rep. No. 222):

"As to paragraph (8) of section 9, it was urged that it should be clarified so as certainly to apply only to the use of legal process against an individual employee and so as not to apply to combinations or conspiracies between several employees, or groups of employees, to interrupt interstate commerce. It was frankly stated by the advocates of the bill, both those representing the carriers and those representing the employees, that the purpose of the paragraph was to deal merely with individual employees, to express only the constitutional right of individuals against involuntary servitude, and was not intended to deal with combinations, conspiracies, or group action. This construction has been made abundantly clear by an amendment to the bill by which the word 'individual' has been inserted before the word 'employee' wherever the latter word appears in the paragraph."

rules and working conditions, and to settle disputes with all expedition in conference between authorized representatives, but added this distinct prohibition against coercive measures. This addition can not be treated as superfluous or insignificant, or as intended to be without effect. *Ex parte Public National Bank,* 278 U. S. 101, 104. While an affirmative declaration of duty contained in a legislative enactment may be of imperfect obligation because not enforceable in terms, a definite statutory prohibition of conduct which would thwart the declared purpose of the legislation cannot be disregarded. The intent of Congress is clear with respect to the sort of conduct that is prohibited. " Interference " with freedom of action and " coercion " refer to well understood concepts of the law. The meaning of the word " influence " in this clause may be gathered from the context. *Noscitur a sociis. Virginia* v. *Tennessee,* 148 U. S. 503, 519. The use of the word is not to be taken as interdicting the normal relations and innocent communications which are a part of all friendly intercourse, albeit between employer and employee. " Influence " in this context plainly means pressure, the use of the authority or power of either party to induce action by the other in derogation of what the statute calls " self-organization." The phrase covers the abuse of relation or opportunity so as to corrupt or override the will, and it is no more difficult to appraise conduct of this sort in connection with the selection of representatives for the purposes of this Act than in relation to well-known applications of the law with respect to fraud, duress and undue influence. If Congress intended that the prohibition, as thus construed, should be enforced, the courts would encounter no difficulty in fulfilling its purpose, as the present suit demonstrates.

In reaching a conclusion as to the intent of Congress, the importance of the prohibition in its relation to the plan devised by the Act must have appropriate considera-

tion. Freedom of choice in the selection of representatives on each side of the dispute is the essential foundation of the statutory scheme. All the proceedings looking to amicable adjustments and to agreements for arbitration of disputes, the entire policy of the Act, must depend for success on the uncoerced action of each party through its own representatives to the end that agreements satisfactory to both may be reached and the peace essential to the uninterrupted service of the instrumentalities of interstate commerce may be maintained. There is no impairment of the voluntary character of arrangements for the adjustment of disputes in the imposition of a legal obligation not to interfere with the free choice of those who are to make such adjustments. On the contrary, it is of the essence of a voluntary scheme, if it is to accomplish its purpose, that this liberty should be safeguarded. The definite prohibition which Congress inserted in the Act can not therefore be overridden in the view that Congress intended it to be ignored. As the prohibition was appropriate to the aim of Congress, and is capable of enforcement, the conclusion must be that enforcement was contemplated.

The absence of penalty is not controlling. The creation of a legal right by language suitable to that end does not require for its effectiveness the imposition of statutory penalties. Many rights are enforced for which no statutory penalties are provided. In the case of the statute in question, there is an absence of penalty, in the sense of specially prescribed punishment, with respect to the arbitral awards and the prohibition of change in conditions pending the investigation and report of an emergency board, but in each instance a legal obligation is created and the statutory requirements are susceptible of enforcement by proceedings appropriate to each. The same is true of the prohibition of interference or coercion in connection with the choice of representatives. The

right is created and the remedy exists. *Marbury* v. *Madison,* 1 Cranch 137, 162, 163.

We entertain no doubt of the constitutional authority of Congress to enact the prohibition. The power to regulate commerce is the power to enact " all appropriate legislation " for its " protection and advancement " (*The Daniel Ball,* 10 Wall. 557, 564); to adopt measures " to promote its growth and insure its safety " (*County of Mobile* v. *Kimball,* 102 U. S. 691, 696, 697); to " foster, protect, control and restrain" (*Second Employers' Liability Cases,* 223 U. S. 1, 47). Exercising this authority, Congress may facilitate the amicable settlement of disputes which threaten the service of the necessary agencies of interstate transportation. In shaping its legislation to this end, Congress was entitled to take cognizance of actual conditions and to address itself to practicable measures. The legality of collective action on the part of employees in order to safeguard their proper interests is not to be disputed. It has long been recognized that employees are entitled to organize for the purpose of securing the redress of grievances and to promote agreements with employers relating to rates of pay and conditions of work. *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184, 209. Congress was not required to ignore this right of the employees but could safeguard it and seek to make their appropriate collective action an instrument of peace rather than of strife. Such collective action would be a mockery if representation were made futile by interferences with freedom of choice. Thus the prohibition by Congress of interference with the selection of representatives for the purpose of negotiation and conference between employers and employees, instead of being an invasion of the constitutional right of either, was based on the recognition of the rights of both. The petitioners invoke the principle declared in *Adair* v. *United States,* 208 U. S. 161, and *Coppage* v. *Kansas,* 236 U. S. 1,

but these decisions are inapplicable. The Railway Labor Act of 1926 does not interfere with the normal exercise of the right of the carrier to select its employees or to discharge them. The statute is not aimed at this right of the employers but at the interference with the right of employees to have representatives of their own choosing. As the carriers subject to the Act have no constitutional right to interfere with the freedom of the employees in making their selections, they cannot complain of the statute on constitutional grounds.

A subordinate point is raised by the petitioner under Section 20 of the Clayton Act. This section provides, in substance, that no injunction shall be granted in any case growing out of a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property or to a property right. This provision has been said to be declaratory of the existing law. *Duplex Printing Press Company* v. *Deering*, 254 U. S. 443, 470. It may be doubted whether Section 20 can be regarded as limiting the authority of the court to restrain the violation of an explicit provision of an act of Congress, where an injunction would otherwise be the proper remedy. It is not necessary to pass upon this point, for if it could be said that it was necessary in the present instance to show a property interest in the employees in order to justify the court in granting an injunction, we are of the opinion that there was such an interest, with respect to the selection of representatives to confer with the employer in relation to contracts of service, as satisfied the statutory requirement. See *Coppage* v. *Kansas, supra,* pp. 14, 15.

We do not find that the decree below goes beyond the proper enforcement of the provision of the Railway Labor Act.

*Decree affirmed.*

MR. JUSTICE MCREYNOLDS did not hear the argument and took no part in the decision of this case.