**AKRON, CANTON & YOUNGSTOWN R. CO. et al.**

v.

**BARNES et al.**

**No. 11116–11161.**

United States Court of Appeals, Seventh Circuit.

Aug. 10, 1954.

Schnackenberg, Circuit Judge, dissented.

Kenneth F. Burgess and D. Robert Thomas, Chicago, Ill., Howard Neitzert, Walter J. Cummings, Jr., Martin M. Lucente, William K. Bachelder, Chicago, Ill., for appellant; Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel.

Lester P. Schoene, Washington, D. C., Alex Elson, Chicago, Ill., Milton Kramer, Washington, D. C., Clarence M. Mulholland, Toledo, Ohio, Edward J. Hickey, Jr., Washington, D. C., for appellees; Schoene and Kramer, Washington, D. C., Mulholland, Robie & Hickey, Washington, D. C., of counsel.

Before LINDLEY, SWAIM, and SCHNACKENBERG, Circuit Judges.

LINDLEY, Circuit Judge.

Plaintiffs, constituting the principal railroads of the United States, sued in the District Court for a declaratory judgment as to their statutory duty as interstate carriers to bargain upon two specific proposals submitted by defendants, bargaining agents for plaintiffs' employees, under the pertinent provisions of the Railway Labor Act, 45 U.S.C.A. § 151 et sequi. The District Court dismissed the amended complaint because it believed that the facts presented did not present a justiciable controversy. The only issue before us on appeal is whether this determination was correct.

Accepting the averments of the complaint as true, as the court was bound to do, they reveal that defendants submitted certain written proposals to plaintiffs in negotiation of new union contracts. These included establishment of an insurance and welfare plan and free transportation for the affected employees and their families. Plaintiffs took the posi-

tion that this subject matter did not affect "rates of pay, rules, and working conditions" as defined in the Railway Labor Act, 45 U.S.C.A. § 151a and refused to bargain with reference thereto. Defendants, on the other hand, refused to bargain on any other proposals, unless these two were included. Thus the parties reached a stalemate and negotiations ended.

The dispute was referred to the National Mediation Board, which exhausted its statutory function without resolution of the controversy and terminated its services. Defendants then circulated a strike ballot among the employees, the results of which are not known. On December 28, 1953, the President created an Emergency Board to investigate and report to him with respect to the controversy. On May 15, 1954, the Board issued its report in which it held "that the questions as to whether the demands of the labor organizations for a health and welfare plan and for free transportation come within the language of the Railway Labor Act are 'questions which the Board does not feel it should attempt to answer. They are questions involving statutory construction and for the courts to determine.'"

The amended complaint averred further that "The conference, negotiation and bargaining procedure established by Congress in the Railway Labor Act with respect to the making and maintaining of agreements concerning rates of pay, rules and working conditions has been and is being interfered with and thwarted by the wrongful action of the organizations * * * and of the employees whom they represent in insisting that the 'free transportation' and 'health and welfare' proposals are properly negotiable under the Railway Labor Act and in refusing to bargain and negotiate with respect to the plaintiffs' proposals and the other proposals set out in the May 22, 1953 notice unless plaintiffs agree to bargain and negotiate upon the 'free transportation' and 'health and welfare' proposals, all to the injury and detriment both of the plaintiffs and of the public.

In addition to the injury through such interference with the statutory bargaining process, plaintiffs' public relations are threatened through the wrongful insistence and announcement of the said organizations that plaintiffs have violated and are violating their duty under the Railway Labor Act; a substantial portion of the public may cease dealing with plaintiffs and prospective employees may seek work elsewhere. The economic harm to plaintiffs, to the public and to other employees of plaintiffs which is threatened by way of strikes is predicated on the wrongful insistence of the said organizations and the employees whom they represent upon bargaining and negotiation with respect to the 'free transportation' and 'health and welfare' proposals and upon their refusal to bargain and negotiate as to their other May 22, 1953 proposals and the proposals of plaintiffs unless plaintiffs agree to bargain and negotiate as to those 'free transportation' and 'health and welfare' proposals."

Plaintiffs prayed that the court "declare and decree (a) that the said proposals to amend the existing agreements between the individual plaintiffs and their employees represented by the organizations named in Paragraph 5 of this Complaint so as to provide as set forth under the captions 'Health and Welfare Plan,' 'Rights to Free Transportation' and 'Rules Applicable to Both Home Road and Foreign Road Transportation' do not affect or concern 'rates of pay, rules, or working conditions' within the meaning of those terms in the Railway Labor Act; (b) that the said proposals are not proper subject matter for the collective bargaining required of plaintiffs by the Railway Labor Act; (c) that the plaintiffs are subject to no legal obligation or duty under the terms of the Railway Labor Act or otherwise to confer, treat, bargain or negotiate with their employees or the representatives of their employees as to the subject matter of the said proposals; and (d) that the plaintiffs have such other and further relief

as may be just in the circumstances of this case."

If plaintiffs are to prevail, a substantial controversy affecting present legal interests of the parties must be found to exist on the basis of this factual statement. Those interests must be determined in the light of the Act, the purposes of which pertinent to this inquiry are defined in Section 2, 45 U.S.C.A. § 151a, as follows: "(4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; * * *." Section 2, First, imposes the duty on all carriers to "exert every reasonable effort" to make agreements respecting rates of pay, rules and working conditions, "and to settle all disputes, whether arising out of the application of such agreements or otherwise," in order to prevent interruptions of commerce. 45 U.S.C.A. § 152, First. Section 2, Sixth prescribes the procedure for convening conferences "In case of a dispute * * * arising out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C.A. § 152, Sixth. Either party to a dispute may invoke the services of the National Mediation Board in cases of "(a) A dispute concerning changes in rates of pay, rules, or working conditions not adjusted by the parties in conference", and "(b) Any other dispute not referable to the National Railroad Adjustment Board and not adjusted in conference between the parties or where conferences are refused." 45 U.S.C.A. § 155, First.

Plaintiffs contend on appeal that the Act imposes on them a duty to treat with employee representatives only with respect to "rates of pay, rules, or working conditions;" that these terms do not include the health and welfare and free transportation proposals; and that the dispute between the parties and the stalemate on the interpretation of plaintiffs' duty under the Act presents a justiciable controversy.

■■ The purpose of the Declaratory Judgments Act, 28 U.S.C. § 2201, is to re-move uncertainty from legal relations and clarify, quiet and stabilize them before irretrievable acts have been undertaken; Delaney v. Carter Oil Co., 10 Cir., 174 F.2d 314, certiorari denied Dille v. Delaney, 338 U.S. 824, 70 S.Ct. 71, 94 L. Ed. 501; to avoid multiplicity of suits; Crosley Corp. v. Hazeltine Corp., 3 Cir., 122 F.2d 925, certiorari denied 315 U.S. 813, 62 S.Ct. 798, 86 L.Ed. 1211; and to provide a remedy to a suitor, who otherwise can not have his question adjudicated until his adversary takes the initiative. Employers' Liability Assur. Corp. v. Ryan, 6 Cir., 109 F.2d 690, certiorari dismissed 311 U.S. 722, 60 S.Ct. 1107, 85 L.Ed. 470. The courts quite generally agree that it was the intent of Congress to afford means for settlement of relief for uncertainties respecting legal rights whether before or after a stage of coercion has been reached. See Sunshine Mining Co. v. Carver, D.C., 41 F.Supp. 60; Hann v. Venetian Blind Corp., D.C., 15 F.Supp. 372, affirmed 9 Cir., 111 F.2d 455. Thus, in the Sunshine case, the District Court took jurisdiction where a mining company brought suit against labor unions for a declaration that plaintiff was not engaged in interstate commerce. A civil service employee may have a declaratory judgment as to whether the statute justifies his threatened discharge. United Public Workers of America v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L. Ed. 754; In American Federation of Labor v. W. U. Tel. Co., 6 Cir., 179 F.2d 535, the court held that the District Court had jurisdiction of an action by a labor union for a declaratory judgment as to the interpretation of an existing contract, while in Bowie v. Gonzales, 1 Cir., 117 F.2d 11, the decision was that the District Court had jurisdiction of an action for declaratory judgment to the effect that Congress intended to exempt certain employees from the provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. and that, because of the conflicting contentions concerning the applicability of the Act to certain employees, a justiciable controversy existed. In Oil Workers International Union, Lo-

cal No. 463, v. Texoma Natural Gas Co., 5 Cir., 146 F.2d 62, certiorari denied 324 U.S. 872, 65 S.Ct. 1017, 89 L.Ed. 1426, a controversy arose with respect to the rights of the parties under a labor contract. An action was brought to determine the seniority status of certain employees and to determine what the rights of the parties were under the correct interpretation of the contract. The court said, 146 F.2d at page 65: "The court below found that the controversy between the parties related to their legal rights and liabilities under their contract; that the parties had taken adverse positions with respect to their respective rights and obligations; that, therefore, a justiciable controversy existed, appropriate for judicial determination under the Declaratory Judgment[s] Act. We agree. An employer may establish the seniority rights of an employee in dispute with other employees, as well as general rights which their contract relationship establishes, without waiting to be sued for breach or for damages or for specific performance, and thus secure an 'interpretation of the contract during its actual operation' and stabilize an 'uncertain and disputed relation.' Exhaustion of the administrative remedies granted by the War Labor Disputes Act, 50 U.S.C.A. Appendix, § 1501 et seq., and Executive Order No. 9017, of January 12, 1942, 50 U.S.C.A.Appendix, § 1507 note, to employer and employee is not a prerequisite to the bringing of a court action by either party for an alleged violation by the other of a labor agreement." "The statute * * * should be liberally construed to accomplish the purpose intended, i. e., to afford a speedy and inexpensive method of adjudicating legal disputes without invoking the coercive remedies of the old procedure, and to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships." Aetna Casualty & Surety Co. v. Quarles, 4 Cir., 92 F.2d 321, 325. In E. Edelmann & Co. v. Triple-A Specialty Co., 7 Cir., 88 F.2d 852, 854, certiorari denied 300 U.S. 680,

57 S.Ct. 673, 81 L.Ed. 884, we said: "It was the congressional intent to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage had accrued."

The Supreme Court has said, in Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 240–241, 57 S.Ct. 461, 464, 81 L.Ed. 617: "The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. South Spring [Hill] Gold Co. v. Amador Gold Co., 145 U.S. 300, 301, 12 S.Ct. 921, 36 L.Ed. 712; Fairchild v. Hughes, 258 U.S. 126, 129, 42 S.Ct. 274, 275, 66 L.Ed. 499; Com. of Massachusetts v. Mellon, 262 U.S. 447, 487, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078. * * * Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages. Nashville, C. & St. L. Ry. Co. v. Wallace, supra, 288 U.S. 249, at page 263, 53 S.Ct. 345, 348, 77 L.Ed. 730; Tutun v. United States, 270 U.S. 568, 576, 577, 46 S.Ct. 425, 426, 70 L.Ed. 738; Fidelity National Bank & Trust Co. of Kansas City v. Swope, 274 U.S. 123, 132, 47 S.Ct. 511, 514, 71 L.Ed. 959; Old Colony Trust Co. v. Commissioner, supra, 279 U.S. 716, at page 725, 49 S.Ct. 499, 502, 73 L.Ed. 918. And as it is not essential to the exercise of the judicial power that an injunction be sought, allegations that irreparable injury is threatened are not required. Nashville, C. & St. L. Ry. Co. v. Wallace, supra, 288 U.S. 249, at page 264, 53 S.Ct. 345, 348, 77 L.Ed. 730."

Borchard, in his "Declaratory Judgments," 2d Ed. 58, points out that: "Perhaps the principal contribution that the declaratory judgment has made to the philosophy of procedure is to make it clear that a controversy as to legal rights is as fully determinable before as it is

after one or the other party has acted in his own view of his rights and perhaps irretrievably shattered the *status quo*."

■ We think we may safely apply the language of the Supreme Court in the Aetna case to the facts presented here by way of paraphrase as follows: There is here, as between the parties who face each other in adversary pleading, a dispute relating to their legal rights and obligations arising under the United States statutes. This controversy is definite and concrete, not hypothetical or abstract, for, prior to the suit, the parties have taken adverse positions with respect to their existing obligations, including specifically the question of whether the two proposals insisted upon by the defendants are within the statute governing the parties' duty to negotiate. On the one side the employers claimed that there was no obligation on their part to bargain on the proposals. On the other side, the employees insisted that it was the employers' duty to negotiate with reference thereto and, in view of the railroads' refusal to bargain upon the two proposals, refused to negotiate upon any other matter, withdrew from conference and initiated a vote upon whether a strike would be called. The controversy was as to the present specific rights and duties of the respective parties. Such a dispute is manifestly susceptible of judicial determination. It does not call for an advisory opinion upon a hypothetical basis but seeks an adjudication of the present respective rights and duties of the parties under the statute. This, we think, is a fair paraphrase of the language of the Supreme Court applicable to the present case, as it appears on page 242 of 300 U.S., on page 464 of 57 S.Ct.

We must bear in mind that the Railway Labor Act provides for compulsory bargaining on the subjects described in the Act, and creates legal rights and obligations in that respect. The report of the Advisory Board to the president concluded that whether the proposals in question come within the Act was not for the Board but for the courts. It seems to us that there could be no clearer case of an actual ripened legal controversy between the parties as to their respective statutory rights and obligations. Because the parties could not settle that controversy, negotiations were broken off and the purpose of the Railway Labor Act defeated, for, instead of industrial peace and amicable negotiations, there ensued a complete refusal to negotiate, a breakdown of the procedure created by Congress, and a threat of a nationwide strike. In the absence of relief by way of a declaratory judgment, the parties are left to their ordinary remedies. Suit after suit may be instituted. The employees themselves might have demanded from the court a mandate for negotiations, Virginian Ry. Co. v. System Federation, No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789, but instead of doing so, thus promoting industrial peace, they withdrew on the ground that the railroads were wrongfully refusing to bargain as to the two proposals and disorder, discord and injury were threatened. It was to meet just such disturbing situations, we think that Congress authorized declaratory action before injury occurs. We do not believe that, after the impasse, with a sharply controverted legal question as to statutory obligations remaining unsettled, either party was bound to wait until the other took physical action, or until a strike or lockout was actually instituted. The courts are not powerless to adjudicate the rights of parties, where it is obvious that there is an actual controversy which can be judically determined and to settle which will prevent multiplicity of suits and continued dissension and prevent defeat of the beneficent purposes of the Railway Labor Act.

The judgment is reversed.

SCHNACKENBERG, Circuit Judge.

I must dissent. On November 4, 1953, plaintiffs, who are common carriers engaged in interstate commerce by railroad, filed in the District Court a complaint for

declaratory judgment,[1] which was, by leave of court, amended on January 15, 1954. On January 20, 1954, the defendants, who are the collective bargaining representatives under the Railway Labor Act,[2] of certain classes of employees of the plaintiffs, filed a motion to dismiss the complaint, as amended, alleging as grounds therefor that the court lacked jurisdiction over the subject matter of the complaint, and that the complaint fails to state a claim against defendants upon which relief could be granted. On February 4, 1954, the District Court sustained this motion, on the ground that no justiciable controversy requiring or admitting of a declaratory judgment had been presented. Accordingly, the court on April 15, 1954, dismissed the action. Plaintiffs appealed to this court.

According to the complaint, as amended, the action involves the interpretation and application of the Railway Labor Act, as amended. It is a class suit as to the defendants, who represent about a million employees of the plaintiffs.

The facts set forth in the complaint, as amended, insofar as they are material here, are now recited.

Pursuant to the provisions of the Railway Labor Act, each of the plaintiffs has heretofore entered into agreements with defendants concerning rates of pay, rules and working conditions. On or about May 22, 1953, each of the defendants gave a thirty-day written notice to the respective plaintiffs of the desire of each defendant to revise and supplement all existing agreements in accordance with accompanying proposals. The notices stated that each defendant had joined with other organizations serving a like notice upon the plaintiffs in the creation of an Employes' National Conference Committee, and that, in the event an agreement was not reached in separate system conferences, the defendant organizations requested each plaintiff to join with other plaintiffs in the creation of a Carriers' National Conference Committee to negotiate said proposals to a conclusion in accordance with the procedures of the Railway Labor Act.

Said proposals were that the existing agreements be amended to provide for changes "concerning rates of pay, rules, or working conditions, under the captions 'Vacations,' 'Holidays' and 'Premium Compensation for Sunday Service'". There were certain additional proposals under the captions of "Health and Welfare Plan," "Rights to Free Transportation" and "Rules Applicable to Both Home Road and Foreign Road Transportation", hereinafter sometimes referred to as "group X", which the complaint charges "do not concern rates of pay, rules, or working conditions". The proposal under the caption "Health and Welfare Plan" was to amend the existing agreements to provide life insurance for each such employee, and all hospital, medical and surgical care incident to any sickness, injury or other disability of any employee, spouse, or other dependents, all such costs to be borne in full by plaintiffs, without reduction by any compensation for sickness, injury or disability of any employee now provided by law, agreement or practice. The proposal under the caption "Rights to Free Transportation" was to amend the existing agreements to provide that free transportation should be granted to said employees both on the employer's line and on the lines of all other railroads. Under the caption "Rules Applicable to Both Home Road and Foreign Road Transportation" there was a request for an agreement extending to employees' wives and dependents the same pass and free transportation privileges, both on the employer's lines and on the lines of all other railroads.

Upon receipt of said notices each plaintiff held a conference or conferences with the organizations which had served the notices, reserving the right to confine the matters at issue to those coming under the collective bargaining provisions of the Railway Labor Act, and plaintiffs notified the defendants of certain proposals submitted by plaintiffs for changes in

---

1. 28 U.S.C.A. § 2201.

2. 45 U.S.C.A. § 151 et seq.

agreements concerning rates of pay, rules or working conditions.

Thereafter plaintiffs created, on a regional basis, Carriers' Conference Committees. The Employes' National Conference Committee and the Carriers' Conference Committees met for the first time on November 3, 1953, when plaintiffs, through their Committees, stated that they were willing to confer, treat, bargain and negotiate with respect to each of the proposals of May 22, 1953, concerning rates of pay, rules or working conditions, and the proposals of the carriers, but that the group X proposals are not proper subjects for collective bargaining under the Railway Labor Act since they do not concern rates of pay, rules or working conditions "and plaintiffs therefore * * * refused to confer, treat, bargain or negotiate" regarding group X.

Said meeting was resumed on November 4, 1953, at which time the Employes' National Conference Committee presented to plaintiffs a reply statement in which they contended that "these working conditions are properly negotiable and are disputes subject to the Railway Labor Act." They called upon the plaintiffs to negotiate upon said matters. Plaintiffs reiterated their previously expressed position, the Employes' National Conference Committee refused to bargain with plaintiffs as to the proposals of the carriers and as to any of the proposals of May 22, 1953, unless plaintiffs would agree to bargain as to group X, and the Employes' National Conference Committee thereupon walked out of and terminated the meeting. The National Mediation Board then endeavored to mediate the controversy. On December 28, 1953, it wrote to the representatives of both sides that all practical methods provided in the Railway Labor Act for its adjustment of the suit had been exhausted without effecting a settlement and the Board gave notice that its services had that day been terminated under the act. The defendants have announced that they have circulated ballots to the employees whom they represent to vote upon a proposal to call a strike or strikes with respect to all their proposals of May 22, 1953.

On December 28, 1953, the President of the United States created an emergency board to investigate and report to him with respect to the disputes between the carriers "and certain of their employees represented by the fifteen co-operating (non-operating) railway labor organizations" named as defendants herein.[3]

The complaint, as amended, alleges that it is highly desirable in the interest of the public, the plaintiffs, and their employees represented by defendants, that this controversy be resolved by the court; that a continuance of the amicable relationship of the plaintiffs and the said employees and the continuance of transportation service to the public is threatened with impairment if the legal controversy as to their statutory rights and duties is not speedily resolved by the court; that the bargaining procedure established by the act with respect to agreements concerning rates of pay, rules and working conditions is being interfered with and thwarted by the wrongful action of the defendants and of the employees whom they represent in insisting that the group X proposals are properly negotiable under the act and in refusing to bargain with respect to plaintiffs' proposals and the other proposals set out in the May 22, 1953 notice unless plaintiffs agree to bargain upon the above captioned proposals, all to the injury both of the plaintiffs and of the public, and in addition plaintiffs' public relations are threatened through the wrongful insistence and announcement of defendants that plaintiffs have violated their duty under the act; a substantial portion of the public may cease dealing with plaintiffs, and prospective employees may seek work elsewhere.

Plaintiffs' prayer is that the court adjudge, declare and decree (a) that the

3. No report of the emergency board is in the record of the District Court as transmitted to this court.

group X proposals do not affect or concern rates of pay, rules, or working conditions within the meaning of the act, (b) that they are not a proper subject matter for collective bargaining required of plaintiffs under the act, (c) that plaintiffs are subject to no legal obligation under the act or otherwise to bargain with defendants as to said proposals, and (d) grant plaintiffs general relief.

Plaintiffs, in bringing this action, rely upon the Declaratory Judgments Act, 28 U.S.C.A. § 2201, which provides as follows:

> "In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

The limitation of the act to a "case of actual controversy" is required by article III of the constitution, which is to the effect that only "cases or controversies" may be decided by the federal courts. Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617. In the Aetna case, 300 U.S. at page 240, 57 S.Ct. at page 464, the court said:

> "A 'controversy' in this sense must be one that is appropriate for judicial determination. Osborn v. [President etc., of] United States Bank, 9 Wheat. 738, 819, 6 L.Ed. 204. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. United States v. Alaska S. S. Co., 253 U.S. 113, 116, 40 S.Ct. 448, 449, 64 L.Ed. 808. The controversy must be definite and concrete,

touching the legal relations of parties having adverse legal interests. South Spring [Hill] Gold Co. v. Amador Gold Co., 145 U.S. 300, 301, 12 S.Ct. 921, 36 L.Ed. 712; Fairchild v. Hughes, 258 U.S. 126, 129, 42 S.Ct. 274, 275, 66 L.Ed. 499; [Com. of] Massachusetts v. Mellon, 262 U.S. 447, 487, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."

The question before us is whether the complaint, as amended, sets forth a justiciable controversy as so defined and limited.

Defendants have presented to the plaintiffs, pursuant to the provisions of the Railway Labor Act,[4] proposals for changes in agreements affecting rates of pay, rules, or working conditions, and plaintiffs have submitted to defendants proposals for other changes in said agreements. Conferences between the representatives of the respective parties ended because plaintiffs insisted they would not bargain upon the group X proposals, claiming that they are not within the purview of section 152, First of the act[5] which makes it the duty of all carriers and employees to exert every reasonable effort to make agreements concerning rates of pay, rules and working conditions, and section 156, which itself refers to intended changes in such agreements.

At the time that the complaint was filed in this case the efforts of the Mediation Board, acting under the act,[6] had failed to change the situation and an emergency board had been appointed by the President of the United States pursuant to section 160 of the Act, 45 U.S.C.A. § 160, which board had not yet made a report. However, defendants announced that they had taken steps to have the

**4.** 45 U.S.C.A. § 156.

**5.** 45 U.S.C.A. § 152, First.

**6.** 45 U.S.C.A. §§ 154, 155.

employees, whom they represented, vote upon a proposal to call a strike or strikes with respect to their proposals.

The Transportation Act of 1920 [7] set up the Railroad Labor Board as a means for the peaceful settlement, by agreement or by arbitration, of labor controversies between interstate carriers and their employees. However, the decisions of the Board were supported by no legal sanction. The disputants were not in any way to be forced into compliance, except through the effect of adverse public opinion. In 1926, this act was repealed and the Railway Labor Act was enacted.[8] By the new measure, Congress continued its policy of encouraging the amicable adjustment of labor disputes by their voluntary submission to arbitration before an impartial board, but it supported that policy by the imposition of legal obligations. For instance, it provided means for enforcing the award obtained by arbitration between the parties to labor disputes. It recognized the right of the parties to designate representatives for the purposes of the Act "without interference, influence, or coercion exercised by either party over the self-organization or designation of representatives by the other". Under the last mentioned provision it was held in Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034, that the statute protected the freedom of choice of representatives, which was an essential of the statutory scheme, with a legal sanction which it was the duty of courts to enforce by appropriate decree. The prohibition against such interference was continued and made more explicit by an amendment adopted in 1934. The Railway Labor Act, as amended, added new provisions: section 2, Ninth [9] makes it the duty of the Mediation Board, when any dispute arises among the carrier's employees "as to who are the representatives of such employees", to investigate the dispute and to certify the name of the organization authorized to represent the employees. It commands that "Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this Act."

After considering these statutory changes, the court, in Virginian Ry. Co. v. System Federation, 300 U.S. 515, at page 545, 57 S.Ct. at page 598, said:

"It is, we think, not open to doubt that Congress intended that this requirement be mandatory upon the railroad employer, and that its command, in a proper case, be enforced by the courts. The policy of the Transportation Act of encouraging voluntary adjustment of labor disputes, made manifest by those provisions of the Act which clearly contemplated the moral force of public opinion as affording its ultimate sanction, was, as we have seen, abandoned by the enactment of the Railway Labor Act. Neither the purposes of the later Act, as amended, nor its provisions when read, as they must be, in the light of our decision in the Railway Clerks case, supra, lend support to the contention that its enactments, which are mandatory in form and capable of enforcement by judicial process, were intended to be without legal sanction."

There is no question raised in the case at bar as to the authority of the respective representatives of the employees and the carriers who entered into the conferences initiated for the purposes of considering the proposals of intended changes in the existing agreements, as provided for in the act.[10] The act specifically recognizes that intended changes may be proposed by both carriers and representatives of the employees, and provides for conferences thereon.

In the case at bar it became the duty of each side to bargain with the other in regard to proposals to change existing agreements affecting rates of pay, rules,

7. C. 91, 41 Stat. 456, 469.

8. 45 U.S.C.A. § 151 et seq.

9. 45 U.S.C.A. § 152.

10. 45 U.S.C.A. § 156.

or working conditions, submitted by either side. The performance of this duty, in a proper case, will be enforced by the courts in an action brought by either party against the other. If plaintiffs feel aggrieved by an allegedly unjustified refusal by the employees' representatives to confer and bargain with the plaintiffs in regard to the latter's requests for changes in existing agreements, the courts are open to the plaintiffs to secure enforcement of the defendants' duty in that regard. Conversely, the defendants have a right to resort to the courts for similar relief as to their proposed changes, including group X.

As to the proposed changes submitted by defendants, the complaint, as amended, avers that defendants have been insistent that they will not bargain with the plaintiffs unless group X proposals are included in the negotiations. That defendants are in earnest is indicated by their preparations for a strike vote in support of their position. However, one cannot speculate with profit as to the future course of defendants in regard to their proposals. They may never file an action in court to compel the carriers to bargain on group X proposals. If they take such action, the carriers, by way of defense, may procure from the court, in that case, a decision on the point which they now urge in the case at bar. They are not entitled to have in advance a declaratory judgment to the effect that they will have a good defense when and if that cause of action is asserted. Public Service Commission v. Wycoff Co., 344 U.S. 237, at page 248, 73 S.Ct. 236, 97 L.Ed. 291.

As to the plaintiffs' proposals for changes in existing agreements, they have a right to bring an action in court to force the defendants to bargain thereon. In such a case plaintiffs could urge and obtain a decision such as they ask in the case at bar. They cannot assure themselves of a favorable decision by a declaratory judgment in advance of filing such a suit.

We thus see that the question of who is right in the present dispute may be settled in an action brought by either party to force its adversaries to bargain upon proposals for changes in existing agreements. The declaratory judgment procedure may not be made the medium for securing an advisory opinion in such a situation. In Public Service Commission v. Wycoff Co., 344 U.S. 237, at page 243, 73 S.Ct. at page 240, the court said:

"But when all of the axioms have been exhausted and all words of definition have been spent, the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power. While the courts should not be reluctant or niggardly in granting this relief in the cases for which it was designed, they must be alert to avoid imposition upon their jurisdiction through obtaining futile or premature interventions, especially in the field of public law."

The defendants made requests for changes in existing agreements and called into play the bargaining machinery outlined by the statute.[11] Inaction developed in the operation of that machinery. The efforts of the Mediation Board failed. The Emergency Board had not yet reported as of the date of the filing of this suit. The record before us shows no steps by the defendants to strike, other than a reference to the taking of a strike vote among the employees. The question of what effect, if any, a calling of a strike would have is not before us and is not considered by me. Whatever the rights of plaintiffs may be, they have not been legally injured by defendants' insistence that bargaining must include group X. Lacking a showing of legal injury to plaintiffs' rights, they can find no support in Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, for the maintenance of a de-

---

11. 45 U.S.C.A. § 156.

claratory judgment proceeding. In that case it was held that a declaratory judgment action was maintainable, but the court significantly pointed out, 300 U.S. at page 239, 57 S.Ct. at page 463 that, while the defendants there had not instituted any action wherein the plaintiff would have an opportunity to prove the absence of the alleged disability claimed by the defendant insured, yet "plaintiff points to the danger that it may lose the benefit of evidence through disappearance, illness, or death of witnesses; and meanwhile, in the absence of a judicial decision with respect to the alleged disability, the plaintiff in relation to these policies will be compelled to maintain reserves in excess of $20,000."

The majority relies upon a report of the Emergency Board said to have been filed on May 15, 1954, which was more than two months after the order appealed from was entered. This report is said to conclude that whether the proposals in question come within the (Railway Labor) act was not for the Board but for the courts. I feel that the correctness of the order appealed from must be judged by the record then before the trial court and cannot be based upon a subsequent report of any board, which necessarily could not have been brought to the attention of the trial court at or prior to the time when it entered the order now being reversed. While the Emergency Board has no power to determine a question of jurisdiction of the federal courts, no one denies that the dispute between the plaintiffs and the defendants can be settled by the courts in an enforcement suit brought by either party, as hereinbefore pointed out. But there is now presented to this court a matter not cognizable in a declaratory judgment proceeding.

For the reasons hereinbefore set forth, I hold that the complaint, as amended, does not present a justiciable controversy and I would affirm the judgment of the District Court.